AMERICAN TIMBER CO., a corporation, F. H. Stoltze Land & Lumber Co., Inc., a corporation, Louisiana-Pacific Corporation, a corporation, Rudolph B. Hoecker, George Stearns, Harold McLaughlin, and Richard G. Walters, Plaintiffs,

v.

Bob BERGLUND, Secretary of Agriculture, Individually and in his official capacity, R. Max Peterson, Chief, Forest Service, United States Department of Agriculture, Individually and in his official capacity, Tom Coston, Regional Forester, Region I, Forest Service, United States Department of Agriculture, Individually and in his official capacity, and John Emerson, Forest Supervisor, Flathead National Forest, Individually and in his official capacity, Defendants.

No. CV 76–115–M.

United States District Court, D. Montana, Missoula Division.

July 16, 1979.

---

. . . .

C–50.

C–57.

John O. Mudd, Mulroney, Delaney, Dalby & Mudd, Missoula, Mont., Leonard B. Netzorg, Portland, Or., for plaintiffs.

Robert T. O'Leary, U. S. Atty., Butte, Mont., for defendants.

## OPINION

RUSSELL E. SMITH, District Judge.

In this action plaintiffs challenge the validity of the Draft Environmental Impact Statement (DEIS) and Final Environmental Impact Statement (FEIS) issued by the Flathead National Forest.

The corporate plaintiffs all own and operate sawmills and related facilities which depend on the Flathead National Forest (Flathead Forest) for an adequate supply of timber to meet their operational needs. As a consequence they also have an interest in decisions affecting the general management of the forest. The corporate plaintiffs' mills employ together approximately 245 persons directly and additional workers indirectly through their logging subcontractors. The products of the mills are lumber and related wood products used primarily in home construction in Montana and throughout the United States.

The individual plaintiffs are residents of communities located within the Flathead Forest, and each makes use of the Flathead Forest for his recreation, either in fishing, horseback riding, hiking, photography, hunting, or related pursuits. To gain access to the Flathead Forest, these plaintiffs use timber access roads constructed as a consequence of sales of federal timber in the Flathead Forest.

The named defendants are the current line officers of the Forest Service, United States Department of Agriculture, and the Secretary of Agriculture. They have direct supervisory responsibility for the management of the Flathead Forest.

In 1969, the Supervisor of the Flathead Forest issued a timber management plan for the years 1969 to 1979, setting forth, among other things, the rate and manner of timber harvest for the Flathead Forest, as well as various silvicultural practices for the forest. That plan, as adjusted for matters not material here, called for an annual allowable cut of 181.6 MM board feet using conventional logging techniques. The allocation of lands for commercial timber growing and harvesting had been made in a prior land management plan also issued by Flathead Forest personnel.

In April 1972, the new forest supervisor, original Defendant Edsel L. Corpe, issued a public brochure called "Fact Sheet" which proposed reducing the annual allowable cut from 181.6 MM board feet to 128.6 MM board feet. The fact sheet was followed in July 1973 by a "Draft Environmental Statement, Interim Revision, Flathead National Forest" which proposed to set the annual allowable cut (by then renamed "programmed harvest") at 110.4 MM board feet. The FEIS, issued May 30, 1974, established the annual allowable cut at 121.4 MM board feet.

The DEIS and FEIS proposed changes not only for the 1969 timber management plan, but also for the preceding land management plan. However, no separate land management plan or timber management plan was issued, the intent of the Forest Service personnel being that the FEIS would itself constitute the plan for modification of both the prior land use and timber management plans.

From what has been said it is obvious that the sort of planning represented by the timber management plan, the fact sheet, and the environmental impact statements is a continuing process in the Forest Service. The FEIS here is labeled "Interim Revision—Flathead National Forest Ten-Year Timber Management Plan," and the plan itself envisages revisions prior to the expiration of ten years.

The FEIS does state a policy which is designed to provide a continuous, sustained, even yield of timber, and at the same time accommodate the principles of multi-use management.

Two basic controversies are presented: one, what amount of timber may be cut

annually; and, two whether the plans for the management of the Flathead Forest provide for an adequate and timely removal of presently-mature timber. The timber industry wants the volume of what is now called the "programmed harvest"[1] to be raised, and, along with the individual plaintiffs, it wants the mature timber removed in a timely manner to prevent loss because of age, disease, and fire. The court's function is not to decide these issues but to determine whether the Forest Service in deciding them complied with the requirements of the National Environmental Policy Act. 42 U.S.C. §§ 4321–4361.

The reduction in the potential yield was a result of (1) a change in the stratification of the land base; (2) a change in the conversion period (i. e., as used in the FEIS, the time allowed for the removal of the old growth, mature timber, high and low risk); and (3) a change in the projected yield of the managed timber lands. These factors are discussed separately.

(1)

The most important factor accounting for 60% to 80% of the reduction in the potential yield was the change in the land stratification. In the DEIS and FEIS, the components of stratification (i. e., high area, marginal, special, standard, and deferred) are all defined in general terms. Illustratively, "high area" is defined as "[l]and areas of subalpine and alpine vegetation types. These are thin soil areas where trees are usually unmerchantable, slow growing, and difficult to regenerate. These areas often have high scenic values." FEIS, p. 5.

Prior to 1972, the high area zone had been determined. In 1972 the land stratification was changed, and an additional 194,-

568 acres were placed in the high area zone. Of this, 118,034 acres had previously been classified as commercial forest land. Since the high area zone was not to be logged, or at least logged only under very special conditions, this reduction in commercial forest land reduced the amount of harvestable timber. The high area zone is not described legally or by reference to geographic landmarks, and is shown in the DEIS and FEIS only as a figure in a land stratification table. Likewise, neither the 1972 fact statement nor the DEIS describe the methods of classification, but from responses to criticisms of the DEIS contained in the FEIS it appears that the district rangers, using their individual judgments as to the application of regional guidelines, made the classification, and from the record it appears that the results were shown by delineating the high area zones on maps. These maps do not form a part of the FEIS but are available in the offices of the Flathead Forest. Nowhere do the reasons why the judgments as to the classifications of the 118,034 acres made prior to 1972 differed from those made in the FEIS.

(2)

The 1969 plan fixed the conversion period[2] at 34 years and indicated that it could be lowered to 32 years.

The FEIS states:

The conversion period for removal of old-growth sawtimber stands will be temporarily lengthened to 50 years rather than the 42-year[3] period provided for in the existing timber management plan. This will provide additional recovery time between regeneration cuts in order to stabilize the hydrologic balance in watersheds. As more specific hydrologic infor-

---

1. The term "potential yield" may be roughly defined as a theoretical figure representing the volume of timber which the forest has the capacity to yield annually under the constraints imposed by various Forest Service guidelines. The term is used interchangeably by the Forest Service with the term "allowable annual cut." The term "programmed harvest" is roughly defined as that portion of the potential yield which will be actually offered for sale if sufficient funds for road construction, etc., are available.

2. In the 1969 plan the conversion period related only to high risk timber.

3. The source of the 42 years is unclear. The 1972 plan fixed the conversion period at 50 years. Perhaps the author intended to distinguish between high-risk timber and all-mature timber, or perhaps to state what was actually being done instead of what the timber management plans said they were to do.

mation is developed, drainage by drainage, the old-growth conversion period may be adjusted.

FEIS, p. 9 (asterisk omitted; footnote added). In the comments generated by criticisms, it was stated that the true conversion period for "all mature sawtimber (high and low risk) was changed from 39 years in the original plan to about 43 years in the revised plan." FEIS, p. 33.

The record reveals a conflict of opinion between the hydrologists employed by the Forest Service and those employed by the timber industry. If, however, the conflicts be resolved in favor of the Forest Service experts, as they must, still it is clear that the Forest Service hydrologists, in considering the conversion period, treated the forest as a unit. In fact the watersheds differ; some show signs of erosion; some do not; there is a more rapid regeneration in some water sheds than in others. The DEIS was criticized because, in the determination of the conversion period, there was a blanket rather than a separate watershed appraisal, and while this criticism is mentioned in the FEIS, it is not answered.

Further justifications for the change in the conversion period were stated in this language:

Other factors in the decision to change the conversion period include aesthetics (this is a technical term meaning the Flathead would look like a wreck to many people if all its old-growth timber were cut in the next 34 years) and recognition that the taxpayers can't afford the cost of building roads that fast.

FEIS, p. 33. These justifications are completely conclusory. Whether the aesthetes were considering a spread between 34 and 50 years as the FEIS suggests, or a spread of 39 to 43 years as the comments suggest, cannot be known. But a difference in the time lag could make a great difference in the balance between the beauty sacrificed by a speedy removal and the beauty achieved by the lessening of the dangers from fire and blister rust. Apparently the balancing, if any, was done by others than Forest Service personnel, and in any event the basis upon which it was done is not clear.

What factors went into the conclusion that the "taxpayers can't afford the cost of building roads that fast" is not shown. Was the continuing inflation considered? Were the costs of roads providing for an early removal of high-risk timber compared with the savings from a reduced mortality? Further, since the cost of roads is a factor in determining the programmed annual harvest, it is not quite clear how it affects the determination of the potential yield.

(3)

The conclusion that the managed timber stands would not yield as much as had been projected in earlier plans is supported by a statement that the change is due to "improved information." What the information is is not shown.

■ The environmental impact statement has two basic purposes:

First, it should provide decision-makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in light of its environmental consequences. . . . Secondly, the impact statement should provide the public with information on the environmental impact of a proposed project as well as encourage public participation in the development of that information.

*Trout Unlimited v. Morton,* 509 F.2d 1276, 1282 (9th Cir. 1974) (footnote omitted).

The statute provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . . (D) without observance of procedure required by law." 5 U.S.C. § 706(2)(A) and (D). In *Lathan v. Brinegar,* 506 F.2d 677, 693 (9th Cir. 1974), it was said: "We think that the courts will better perform their necessarily limited role in enforcing NEPA if they apply § 706(2)(D) in reviewing environmental impact statements for compliance with NEPA than if they (*sic*) confine themselves within

the straight jacket of § 706(2)(A)." In *Trout Unlimited v. Morton,* 509 F.2d 1276, 1283 (9th Cir. 1974), the court made it clear that, in the absence of a more precise definition of "procedure required by law," the courts have had to and do fix the standards in response to the needs of a particular case.

■ I would not fault the DEIS or the FEIS for their treatment of the land base. It is true that the stratifications are fixed with little explanation, and it may well be that the stratifications were adopted from previous studies and not especially made for the DEIS here. Where, however, an agency is engaged in a continuing study, I think the results of previous work may be incorporated in a DEIS. Whether the work was done for a previous study or for the DEIS here, the land stratification represents the judgment of professional foresters applying definitions to particular land and reflecting that judgment in area maps. Certainly the process could be more elaborate and could employ studies analyzing the soil and relating the average temperature and snowfall to specific areas. But I think a professional forester is competent to express a judgment as to whether a given area has fragile soils, and more is not needed. *See Minnesota Public Interest Research Group v. Butz,* 541 F.2d 1292 (8th Cir. 1976).

■ I do fault the FEIS for its treatment of conversion periods. It is conceded by all that mature trees are, as they age, increasingly subject to mortality by fire, insects, disease, and epiphytes. An essential part of any long-term forest management problem involves a consideration of the removal of mature high-risk timber. In 1969 the authors of the 1969–1979 management plan were extremely conscious of that problem and stated that the "key to the allowable cut . . . is to select a conversion period for cutting the mature high risk stands." It was then determined that 43% of the forested area was in the high-risk category; that there was an annual mortality rate of 18 MM board feet; and that a conversion period of 34 years was selected and it was suggested that under proper management a conversion period of 32 years might be proper. In view of the removal problem, the authors were concerned with reducing rather than increasing the conversion period. The authors of the 1974 FEIS lengthened the conversion period and initially justified it solely on hydrological grounds. The FEIS did not discuss the volumes of timber lost by reason of the increase in the conversion period. It did not discuss the reasons for treating the entire forest uniformly instead of relating conversion periods to differing watersheds. It did not discuss the reasons for postponing the restocking of 24,400 unstocked acres until the fourth decade and the effect that a prompt restocking might have on a conversion period. It did not discuss the potential losses resulting from the fact that a delay in regeneration caused by a delay in cutting reduces the potential growth of the forest.[4] If, as the FEIS states, the annual programmed harvest, and hence the actual cutting, will be less than the potential yield, then the actual removal of the high-risk timber will take longer than the stated conversion period if the calculations are based on potential yield rather than on programmed harvest. This is not discussed.

It is possible that the problem presented by the high-risk timber is so close to the surface of a professional forester's mind that all of the questions posed here were considered and answered in the minds of the authors of the DEIS and FEIS, and it may be that all of the merits of a long conversion period were balanced against all of the demerits of such a period and that a balance was struck in favor of the longer period. But the paper work does not reveal what the concerns were or what balances were struck. Certainly the reader of the DEIS and FEIS is not made aware of the process by which the conclusions were reached. In light of that, I conclude that the FEIS was not proposed under the "procedures required by law," and I hold it to be invalid.

---

4. This loss results from the fact that a regenerated stand grows faster than a mature stand.

This opinion constitutes the court's findings of fact and conclusions of law. The parties are granted twenty (20) days to take exceptions and to submit a form of judgment.

I am not sure just what difference this ruling makes. The limiting factor in presently-proposed sales seems to be the economic situation of the Forest Service and not the determination of potential yield. The issuance of any injunctive relief might be dependent upon what plans the Forest Service has in the offing. I will take evidence on the remedy if necessary.