**INTERMOUNTAIN FOREST INDUSTRY ASSOCIATION and Louisiana Pacific Corporation, Plaintiffs,**

v.

**Richard E. LYNG, Secretary, United States Department of Agriculture, Dale Robertson, Chief of the United States Forest Service, J.S. Tixier, Regional Forester for Region 4, and Brian Stout, Forest Supervisor of the Bridger–Teton National Forest, Defendants.**

**MOUNTAIN STATES LEGAL FOUNDATION, a nonprofit Colorado corporation, on behalf of its members, Citizens for Multiple Use, and on behalf of Women in Timber, Dubois Chapter, and its members, Plaintiffs,**

v.

**F. Dale ROBERTSON, Chief of the United States Forest Service; J.S. Tixier, Regional Forester; Brian Stout, Supervisor, Bridger–Teton National Forest, Defendants.**

Nos. C88–0009–B, C88–0010–B.

United States District Court,
D. Wyoming.

April 18, 1988.

---

Constance E. Brooks, Paul Kapp, Karen
Budd, Eric Twelker, Mountain States Legal

Foundation, Denver, Colo., Paul Godfrey, Godfrey and Sundahl, Rick Thompson, Hathaway, Speight, Kunz, Trautwein & Barrett, Cheyenne, Wyo., W. Hugh O'Riordan, Steven R. Ormiston, Lindsay, Hart, Neil & Weigler, Boise, Idaho, Michael E. Haglund, Jack L. Landau, Lindsay, Hart, Neil & Weigler, Portland, Or., for plaintiffs.

Craig Paul Kapp, Godfrey and Sundahl, Cheyenne, Wyo., Andrew F. Walch, Patricia L. Weiss, Dept. of Justice, Div. of Lands, Sacramento, Cal., Richard A. Stacy, U.S. Atty., D. Wyo., Carol Statkus, Asst. U.S. Atty., Cheyenne, Wyo., Wells Burgess, Land and Natural Resources Div., Dept. of Justice, Washington, D.C., for defendants.

Henry C. Phibbs II, Phibbs & Resor, Jackson, Wyo., for Jackson Hole Alliance for Responsible Planning.

Thomas D. Lustig & Christine A. Klein, National Wildlife Federation, Boulder, Colo., and Rodger McDaniel, Cheyenne, Wyo., for WWF, NWF, Sierra Club, WOC & Dubois Wildlife.

Rick Thompson, Hathaway, Speight, Kunz, Trautwein & Barrett, Cheyenne, Wyo., W. Hugh O'Riordan, Steven R. Ormiston, Lindsay, Hart, Neil & Weigler, Boise, Idaho, for Intermountain Forest/Louisiana Pacific.

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

BRIMMER, Chief Judge.

This matter came before the Court on plaintiffs' motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a). An evidentiary hearing was conducted at which all parties were represented by counsel. The Court, having heard the arguments of counsel, having reviewed the pleadings and the evidence presented by the parties, and being fully advised in the premises, FINDS, CONCLUDES and ORDERS as follows:

This is a challenge to the 1988 timber harvest levels announced for the Bridger-Teton National Forest. Plaintiffs include the Intermountain Forest Industries Asso-ciation, Louisiana Pacific Corporation, the Mountain States Legal Foundation, Women in Timber and Citizens for Multiple Use. Defendants are the Secretary of Agriculture, the Chief of the Forest Service, the Regional Forester, and the Supervisor of the Bridger-Teton National Forest.

Plaintiffs contend that the defendants are violating a Timber Management Plan ("TMP") prepared by the Bridger-Teton National Forest in 1979. The TMP projects annual timber harvests of approximately 28.4 million board feet ("mmbf"). Approximately one-half of the timber is to be cut in the northern portion of the Bridger-Teton National Forest. This area constitutes the "working circle" of Louisiana Pacific's Dubois, Wyoming sawmill.

On January 6, 1988, the Bridger-Teton National Forest announced planned timber sales for 1988. The announcement projects annual sales of approximately 14.4 mmbf. Less than 6 mmbf is green sawtimber. All of the 7 mmbf offered in the north end of the forest is unsuitable for sawmill operations.

Plaintiffs seek a preliminary injunction requiring the United States Forest Service to operate the Bridger-Teton National Forest in accordance with the TMP and to take immediate steps to offer timber for harvesting at levels specified in the TMP. Plaintiffs failed to make a showing sufficient to justify preliminary injunctive relief. Their motion will be denied.

## I. FACTS

### A. The TMP

The Bridger-Teton National Forest is managed under ten Ranger District Multiple Use Plans adopted pursuant to the Multiple-Use Sustained-Yield Act of 1960 ("MUSYA"), 16 U.S.C. §§ 528-531, four unit plans, and several single resource plans. Tr. at 71-76 (testimony of Mr. Stout). Multiple use and unit plans "allocate land and resources for the various multiple uses permitted on the forest and provide direction for the coordination of these uses." TMP, EIS at 1-3. Single resource plans in contrast "are subordinate

to the multiple use or unit plans, [and] translate the general land management direction they contain into specific guidelines for the management of a particular resource." *Id.*

The TMP is a single resource plan. *Id.* It was prepared and adopted in 1979 and accompanied by an environmental impact statement. The TMP has not been formally amended or revised.

Revisions are planned "as the need arises." A change of plus or minus ten percent in the commercial forest land area or a change of plus or minus in the potential timber yield triggers a review. TMP at 70. Neither change has occurred.

The Secretary of Agriculture affirmed the plan on May 16, 1980. Gov.Ex. 5. The Secretary cautioned, however, that the Bridger–Teton National Forest "contains some of the best elk habitat in North America" and that "it is of utmost importance that the Forest Service practice management on this forest which will minimize the impact on the elk habitat to the fullest extent possible consistent with multiple use management." The Secretary accordingly directed the Forest Service to consult with the Wyoming Game and Fish Department before permitting any harvesting under the plan. Finally, the Secretary noted that the TMP must be "considered an interim plan only." *Id.*

The TMP ennunciates "the overall management direction and objectives for timber management activities" in the Bridger–Teton National Forest. TMP at 66. It also identifies goals for timber harvesting and establishes guidelines to achieve those goals. Timber harvest goals are products of the land base suitable for commercial timber harvesting and of timber volumes which can be harvested feasibly—the annual programmable harvest.

### 1. Commercial Forest Land Base

The TMP first quantifies the land base available for timber production. The net area of the Bridger–Teton National Forest is 3,400,267 acres. TMP at 12 (Table 3–1). Approximately fifty-five percent, or 1,863,902 acres, is classified as "non-forest" or unproductive forest. The remaining 1,536,365 acres are productive forest. *Id.*

Productive forest land is classified as "reserved, deferred and commercial." TMP at 12. "Reserved" land has been withdrawn from timber utilization by statute, regulation or land use plans approved by the Regional Forester. TMP at 115. "Deferred" land includes areas identified for study as possible wilderness area. TMP at 114. Together these two classifications account for 567,261 acres, or approximately thirty-seven percent of the total productive forest land in the Bridger–Teton National Forest. TMP at 12 (Table 3–1).

The remaining 969,104 acres are classified as "commercial" forest land capable of producing crops of industrial wood. TMP at 12 (Table 3–1), 114. "Unregulated" commercial forest (land used as campsites, ranger stations and guard stations, for example) constitute 12,257 acres of commercial forest which is not managed for timber production. TMP at 12 (Table 3–1), 117. Nearly fifty-four percent of the commercial forest is classified as "marginal" land typified by high development costs and low product value. TMP at 12 (Table 3–1), 114. "Special" lands comprise 251,565 acres of commercial forest land. TMP at 12 (Table 3–1). Standard commercial forest land comprises only 181,928 acres of the Bridger–Teton National Forest, or only five percent of the total forest land area and less than twelve percent of the total commercial forest land in the Bridger–Teton National Forest. *Id.*

### 2. Planned Harvest Levels

The TMP also establishes "potential yields and harvest levels." TMP, at i. The potential yield is "the harvest that could be planned on commercial forest land considering the productivity of the land, conventional logging technology, standard cultural treatments, anticipated financing for cultural treatments, and relationships with other resource uses and the environment." TMP at 115. The average annual potential yield for the entire Bridger–Teton National Forest is approximately 81 mmbf. *Id.* at 43 (Table 6–3). This figure represents the maximum harvest possible under ideal con-

ditions. It assumes economical access to every forested acre, compatibility with other resources, and an existing market for all volumes harvested. Declaration of Brian Stout at para. 8.

The potential yield is the sum of three components: standard, special and marginal. The standard component is the harvest that:

> (1) can and should be produced through intensive management on standard acres ...; (2) has a reasonable probability of demand and/or funding under the accessibility and economic conditions projected for the plan period; and (3) can be harvested with adequate protection of the Forest resources under standard provisions of the timber sale contract.

TMP at 36, 116. Of the 81 mmbf average annual potential yield, only 21 mmbf falls within the standard component. *Id.* at 43 (Table 6-3). Salvage timber (cutting designed to utilize scattered dead and down trees) constitutes 3.6 mmbf of the standard component. *Id.* at 116, 43 (Table 6-3).

The second element of the annual average potential yield is the special component. Areas requiring special treatment of the timber resource are included in this component. *Id.* at 116. The main purposes of the special component are to promote quality elk hunting and aesthetics. Tr. at 245-46 (testimony of Mr. Baker). The special component is approximately 8 mmbf of the average annual potential yield. TMP at 43 (Table 6-3).

The marginal component makes up nearly two-thirds (51.5 mmbf) of the average annual yield. This component is typified by excessive development cost, low product value or resource protection constraints. *Id.* at 114. Harvests in these areas require special funding, and offerings have a low probability of being accepted by prospective purchasers. *Id.* at 36.

The annual programmed allowable harvest more accurately estimates potential timber harvests. Declaration of Brian Stout at para. 9. The programmed allowable harvest is based on current demand, funding, silvicultural practice and multiple use considerations. TMP at 47. The programmed harvest for fiscal year 1979 was approximately 27 mmbf. *Id.* at 48.

The total ten year timber sales program for the standard and special components is 302.51 mmbf. *Id.* at 68 (Table 9-1). The program projects an annual harvest of approximately 28 mmbf. *Id.; see also* Supplemental Affidavit of James S. Riley, para. 9. Approximately 14 mmbf is programmed for sale within the working circle of the Dubois sawmill (the Pinedale, Gros Ventre and Buffalo Ranger Districts). TMP at 68 (Table 9-1). Salvage timber constitutes roughly 4.3 mmbf of the total annual harvest. *Id.* The ten year timber sales program lists "timber sales volume *objectives* by fiscal year and Ranger District." *Id.* at 67 (emphasis added). The TMP refers to this projection as "annual target volumes." *Id.*

### B. Actual Timber Volumes Offered

On January 6, 1988, the Forest Service announced timber sales scheduled in the Bridger-Teton National Forest during the period from October 1, 1987 to March 31, 1988. The announcement also identifies tentative harvest levels for April 1, 1988 until September 30, 1988. Annual sales of approximately 14.4 mmbf are planned. Less than 6 mmbf is green sawtimber.

From 1978 through 1987, annual timber offerings averaged approximately 24 to 26 mmbf. Gov.Ex. 11. Volumes fluctuated substantially. Until 1982 the volumes offered were below the amounts targeted in the TMP. Tr. at 252 (testimony of Mr. Baker). In 1982 and 1983, offerings considerably exceeded planned harvest levels but declined in 1985. Volumes offered in 1986 and 1987 again exceeded planned harvest levels, in part because the Forest Service offered 12.1 mmbf to make up for three sales which had previously been deferred for further study. Tr. at 121 (testimony of Mr. Stout).

Previous clearcutting, existing topography and soil conditions, elk migration routes and information revealed by site-specific analyses constrain timber harvests in the northern Bridger-Teton National

Forest. Timber harvesting concentrated heavily on this end of the forest for the last 20 to 25 years. More opportunities for harvesting now exist in the southern end of the forest. *Id.* at 106. Clearcutting has been especially heavy within Louisiana Pacific's working circle. Gov.Ex. 6; Tr. at 203–204 (testimony of Mr. Baker). A substantial portion of the remaining land is designated wilderness area. *See* Gov.Ex. 1 (map of Wyoming wilderness areas). Many of the prime timber stands in the northern half of the Bridger–Teton National Forest are depleted. More careful study and analysis must be undertaken before offering the remaining areas for logging. Tr. at 102 (testimony of Mr. Stout). The first constraint on logging in the Bridger–Teton National Forest is a comparative shortage of commercially desirable stands of timber.

Topography also affects harvest levels. Many of the flatter sites in the northern end of the forest have been harvested. *Compare* Gov.Ex. 6 *with* Gov.Ex. 7. The remaining stands may be uneconomical to harvest because of steep slopes and poor soil conditions. Tr. at 100–101 (testimony of Mr. Stout).

The need for elk habitat further limits timber harvesting. Elk migration routes converge in this area. Studies of migration patterns in 1950 and 1980 show ever-narrowing elk migration routes through the Bridger–Teton National Forest. The animals are being forced into the corridor between Yellowstone and Grand Teton National Parks. Gov.Ex. 8. Some evidence connects diminished elk habitat with timber harvesting. *Compare* Gov.Ex. 6 *with* Gov.Ex. 8. *See also* Tr. at 98–99, 103–106.

The TMP was prepared without site-specific data. Tr. at 194–96. Studies of specific stands of timber often reveal that harvesting those stands is impossible.

Announced timber sales in the Bridger–Teton National Forest did not, as plaintiffs contend, "disappear." An analysis of sales from 1978 through 1987 shows a total of 173 sale names. Nine sales are under study. Sixty-five were offered and sold. Sixteen were sold under different names. Seven sales generated no bids. Three sales offered under different names produced no bids. Nineteen were cancelled because of insufficient volume, inaccessibility or other economic reasons. Two were cancelled due to right-of-way problems. Six sales were withdrawn because the stands were located in wilderness or wilderness study areas. Another six sales were deferred because of conflicts with other resources. Forty sales were deferred pending further analysis. Gov.Ex. 10; tr. at 112–18 (testimony of Mr. Stout). In the late 1970's and early 1980's Louisiana Pacific processed 600,000 to one million board feet. The company now processes 1.9 to 2.2 mmbf annually. Tr. at 222 (testimony of Mr. Baker). Louisiana Pacific processed more timber in recent years than ever before. Gov.Ex. 20.

## C. The Relationship between Louisiana Pacific and the Bridger–Teton National Forest

At the time of the hearing, Louisiana Pacific had not decided to close the Dubois sawmill. The sawmill does not depend entirely upon timber from the Bridger–Teton National Forest. Tr. at 227, 232 (testimony of Mr. Baker). Louisiana Pacific's average purchases from the Bridger–Teton National Forest over the last ten years have been 10 to 11 mmbf per year. Gov.Ex. 20; Tr. at 232–33. Louisiana Pacific has reached out 150 to 250 miles to purchase timber. Tr. at 212. The company has not analyzed how far it can economically haul timber to the Dubois sawmill, other than by appraising individual timber sales. *Id.* at 225.

Louisiana Pacific was outbid on two sales in the Bridger–Teton National Forest and two sales in the Shoshone National Forest. The sales in the Bridger–Teton National Forest were the North Fish Creek sale and the North Piney Bench sale. Tr. at 209. The North Fish Creek sale was an important timber sale close to the Dubois mill. The timber was sold at a sealed bid auction. A firm from Afton, Wyoming outbid Louisiana Pacific. Afton is approximately 200 miles from the North Fish Creek site. Tr. at 210, 227. The North Piney Bench sale was on the fringe of Louisiana Pacific's working circle. Tr. at 211.

The sawmill was marginally profitable when operated at a level of 16 mmbf per year. The sawmill was more profitable when it processed 21 mmbf per year. Tr. at 229–30. Profitable operations could be conducted at slightly less than 21 mmbf per year. Tr. at 230. Louisiana Pacific sawed less than 21 mmbf in 1976, 1978, 1983 and 1986 yet earned profits in each of those years. *Compare* Gov.Ex. 20, 17 *with* Gov.Ex. 18.

Periods of losses and closures at Louisiana Pacific's Dubois and Riverton mills correspond to the inflationary cycle and construction declines of the late 1970's. Gov.Ex. 20; Tr. at 219. Present market conditions are different from those which led to the closures in the early 1980's. Tr. at 220.

The normal logging season is from the last two weeks in June until the middle of March. If timber sales were offered that did not require road construction, Louisiana Pacific could harvest the timber within a few weeks after purchasing the timber. It would take longer if roads have to be built. Tr. at 216–17.

## II. STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

A preliminary injunction is an extraordinary remedy. *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir.1984). A party seeking this form of relief must show: irreparable injury for which there is no adequate legal remedy; likelihood of success on the merits; that balancing the harm to both parties weighs in favor of plaintiffs; and that the injunction will not injure the public interest. *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980).

### A. *Irreparable Harm*

■ Plaintiffs failed to show that they will suffer irreparable injury from planned timber sales for 1988. Plaintiffs contend that Louisiana Pacific has no alternate supply of green sawtimber and will close the Dubois sawmill at the end of May when its inventory is exhausted. They failed to show, however, that any resulting injury will be irreparable.

The claim of irreparable harm is speculative. Louisiana Pacific's Chief Forester, Mr. Robert Baker, conceded that the company has not formally decided to close the Dubois sawmill. The mill has a history of repeated temporary closures. There is no showing that the sawmill will close permanently if the injunction is denied.

Louisiana Pacific must share the responsibility for closure of the Dubois sawmill. The company has been outbid on available timber within its working circle and has not engaged in systematic planning to secure adequate timber supplies for the mill. Closure of the mill is not a sole result of Forest Service policies.

Preliminary injunctive relief would not prevent closure of the sawmill. Court-ordered timber sales could not be processed for five to twelve months. Tr. at 110–11 (testimony of Mr. Stout). At the earliest, timber would be available for harvest in September, well past the May closure date. Assuming that timber could be made available immediately, the normal logging season does not begin until the last two weeks in June. If roads have to be built, the process could be delayed further. *Id.* at 216–17 (testimony of Mr. Baker). Even if the injunction issued immediately, sufficient timber could not be harvested in time to prevent a May closure.

Moreover, harvesting all the timber contemplated by the TMP would not ensure continued operation of the sawmill. The mill requires 21 mmbf to operate efficiently. The TMP projects harvests of only 14 mmbf from Louisiana Pacific's working circle. Closure of the sawmill results from a shortage of accessible, high-volume timber stands in the Bridger–Teton National Forest.

### B. *Probable Success on the Merits*

■ Plaintiffs' eventual success on the merits is insufficiently likely to justify preliminary injunctive relief. Planned timber harvest levels for 1988 comply with all applicable statutes and regulations.

Plaintiffs argue first that the Forest Service is violating the Organic Administration

Act ("Organic Act") of June 4, 1987, 16 U.S.C. §§ 473–482, 551, the Multiple Use Sustained Yield Act of 1960 (MUSYA), 16 U.S.C. § 528–531, and Forest Service regulations promulgated at 36 C.F.R. § 221.3 by failing to manage the Bridger–Teton National Forest in a manner assuring a continuous supply of timber. This contention lacks merit.

The Organic Act provides that "[n]o national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessity of citizens of the United States." 16 U.S.C. § 475. The Act envisioned only two purposes for the national forests: conserving water flows and furnishing continuous supplies of timber. *United States v. New Mexico*, 438 U.S. 696, 707, 98 S.Ct. 3012, 3017, 57 L.Ed.2d 1052 (1978).

In this case, an annual average of 24 to 26 mmbf of timber was harvested in the Bridger–Teton National Forest from 1978 to 1987. Gov.Ex. 11. Louisiana Pacific itself purchased an average of 10 mmbf to 11 mmbf annually. Tr. at 232–33 (testimony of Mr. Baker). The evidence shows that the Bridger–Teton National Forest has produced a continuous supply of timber since 1978. The forest will produce "continuous" supplies of timber at harvest levels planned for 1988.

■ Arguing that the Organic Act requires the Forest Service to manage national forests primarily for the production of timber and for the protection of watershed ignores the Multiple–Use Sustained–Yield Act of 1960, 16 U.S.C. §§ 528–531. MUSYA substantially broadened the purposes of the national forests to include "recreation, range, timber, watershed and wildlife and fish purposes." 16 U.S.C. § 528; *United States v. New Mexico*, 438 U.S. at 713, 98 S.Ct. at 3020. These purposes are, however, "supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in the [Organic Act]." 16 U.S.C. § 528.

The Act directs the Secretary of Agriculture to administer all national forests on a multiple-use and sustained-yield basis. 16 U.S.C. § 529. Multiple use is defined as:

... the management of all of the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people; making the most judicious use of the land for some or all of these resources ... over areas large enough *to provide sufficient latitude for periodic adjustments in use to conform to changing needs and conditions; that some land will be used for less than all of the resources;* and harmonious and coordinated management of the various resources, each with the other, without impairment of the productivity of the land, with consideration being given to the relative values of the various resources, *and not necessarily the combination of uses that will give the greatest dollar return or the greatest unit output.* 16 U.S.C. § 531(a) (emphasis added).

Multiple-use sustained-yield administration must consider the relative values of all resources within the national forests. 16 U.S.C. § 529.

MUSYA itself rebuts plaintiffs' assertion that the national forests must be managed primarily for economic reasons. Although MUSYA does not repeal the Organic Act, Congress envisioned the domination of non-timber uses in certain forests. H.REP.NO. 1551, 86th Cong., 2nd Sess. (1960), *reprinted in* 1960 U.S.Code Cong. & Admin.News 2377, 2379. The Act gives range, recreation, and wildlife an equal footing with timber production. *Sierra Club v. Hardin*, 325 F.Supp. 99, 123 (D.Alaska 1971), *rev'd on other grounds sub nom., Sierra Club v. Butz*, 3 E.L.R. 20293 (9th Cir.1973); *National Wildlife Fed'n v. United States Forest Serv.*, 592 F.Supp. 931 (D.Or.1984), *appeal dismissed*, 801 F.2d 360 (9th Cir. 1986).

The National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. §§ 1600–1614, tied the broad discretion to sell timber granted by the Organic Act, 16 U.S.C.

§ 476, to the multiple use concept. Congress provided that:

[f]or the purpose of achieving the policies set forth in the Multiple–Use Sustained–Yield Act of 1960, and the Forest and Rangelands Renewable Resource Planning Act of 1974 the Secretary of Agriculture, under such rules and regulations as he may prescribe, *may sell*, at not less than appraised value, trees, portions of trees, or forest products located on National Forest System lands.

16 U.S.C. § 472a (emphasis added).

Plaintiffs' argument that the Forest Service has violated the Organic Act is specious. First, the Bridger–Teton National Forest has produced and will produce a continuous supply of timber. Second, the Organic Act does not require the Forest Service to manage national forests solely to furnish timber. The Organic Act delegated to the Secretary of Agriculture the discretion whether or not to sell timber. 16 U.S.C. § 476; *Hi–Ridge Lumber Co. v. United States*, 443 F.2d 452, 455 (9th Cir. 1971); *Parker v. United States*, 307 F.Supp. 685, 688 (D.Colo.1969). NFMA modifies the Organic Act by providing that the Secretary "may sell" timber located on national forest land. 16 U.S.C. § 472a(a). Finally, MUSYA establishes additional purposes for the national forests and expressly directs that all uses be considered, not necessarily those producing the greatest dollar return or the greatest unit output. 16 U.S.C. § 531(a). There is no principled basis for plaintiffs' assertion that the national forests must be managed primarily to produce economic benefits.

Management of the Bridger–Teton National Forest complies with regulations promulgated at 36 C.F.R. § 221.3. The regulations provide that:

(a) Management plans for national forest timber resources shall be prepared and revised, as needed, for working circles or other practicable units of national forest. Such plans shall:

(1) Be designed to aid in providing a continuous supply of national forest timber for the use and necessities of the citizens of the United States.

(2) Be based on the principle of sustained yield, with due consideration to the condition of the area and the timber stands covered by the plan.

(3) Provide, *so far as feasible*, an even flow of national forest timber in order to facilitate the stabilization of communities and of opportunities for employment.

(4) Provide for coordination of timber production and harvesting with other uses of national in accordance with the principles of multiple use management.

(5) Establish the allowable cutting rate *which is the maximum amount of timber which may be cut* from the national forest lands within the unit by years or other periods.

36 C.F.R. § 221.3 (emphasis added). For a discussion of the regulation's evolution, see Comment, *The National Forest Management Act of 1976: A Critical Look at Two Trees in the NFMA Forest*, 22 Land & Water L.Rev. 413, 429 nn. 144, 145 (1987).

The evidence shows that management of the Bridger–Teton National Forest has aided in providing a continuous flow of national forest timber. Principles of sustained yield are contained in the Forest Service plan of 100 year rotation in the harvest of the Bridger–Teton National Forest. Tr. at 193 (testimony of Mr. Stout). In administering the forest to provide a sustained yield, "due consideration" must be given to the "condition of the area and the timber stands covered by the plan." 36 C.F.R. § 221.3(a)(2). The Forest Service considered the suitability of forest terrain and soils for timber harvesting as well as the condition of timber stands located within the forest in attempting to assure a sustained yield. *See* Gov.Ex. 7 (map indicating areas of steep terrain, sites susceptible to landslides and areas of poor soil conditions within the Bridger–Teton National Forest). *See also* TMP at 12, 36 (classifying commercial forest and potential yield into standard, special and marginal components). The Forest Service properly considered site-specific conditions in offering, deferring or withdrawing timber sales in the Bridger–Teton National Forest.

Stabilizing local economies is subject to timber management constraints. One purpose of timber planning is "to facilitate the stabilization of communities and of opportunities for employment." 36 C.F.R. § 221.3(a)(3). The regulation, however, contains an escape clause: timber management plans shall stabilize dependent communities and promote employment *"so far as feasible." Id.* Recognizing that strong local economies are a desirable result of timber harvest planning, the lack of commercially profitable timber, limited funds, and protection of other forest resources may supersede local economic development. Indeed, the regulation requires coordination of timber production with other forest uses. *Id.* at § 221.3(a)(4). The regulation imposes no absolute requirement that the national forests be managed to promote local economies.

Plaintiffs next assert that the Forest Service is failing to revise the TMP in compliance with the plan itself. They urge that the TMP, as the operational document for the Bridger–Teton National Forest, binds the Forest Service with the force and effect of law. The Court concludes that the Forest Service complied with the TMP and that the plan itself is not a substantive rule but rather a statement of policy.

Review of the TMP is triggered by a change of plus or minus ten percent in the commercial forest land areas or by a change of plus or minus five percent in the potential yield. TMP at 70. Neither event occurred.

The commercial forest acreage of the Bridger–Teton National Forest had not changed by more than ten percent. Plaintiffs allude to a study prepared for the Greater Yellowstone Ecosystem. The study, which was not received in evidence, apparently shows only 100,000 acres of commercial forest in the Bridger–Teton National Forest. Tr. at 36 (Mr. O'Riordan's opening statement). The TMP in contrast identifies 435,493 acres of commercial forest. TMP at 12 (Table 3–1). Although Mr. Stout was a member of the committee supervising preparation of the Greater Yellowstone study, the analysis was not pre-

pared for or used in management of the Bridger–Teton National Forest.

Plaintiffs also point out that the draft environmental impact statement for the proposed NFMA forest plan shrinks the commercial forest land base to 300,000 acres. Tr. at 33–34 (Mr. O'Riordan's opening statement). The draft environmental impact statement, however, was withdrawn by the Forest Service. Plaintiffs' claim thus is neither relevant nor ripe for review. The proposed forest plan and accompanying environmental impact statement become final agency action only after approval by the Regional Forester. 36 C.F.R. § 219.10(c)(1), (2). Parties aggrieved by the Regional Forester's decision may appeal. *Id.* § 211.18(f). If plaintiffs wish to challenge the forthcoming forest plan, they should exhaust available administrative remedies.

Claims that the Forest Service secretly reduced the commercial forest land base in the Bridger–Teton National Forest are speculative and not ripe for review. The Court must conclude that the Forest Service has not reduced the land suitable and available for commercial timber production.

Similarly, the potential yield from the Bridger–Teton National Forest has not changed by more than five percent. Targets set in the TMP have been substantially met. Indeed, the Forest Service has offered to sell more timber acreage than the plan requires. Plaintiffs assert that planned volumes have not been sold. The Forest Service is not responsible, however, for the fact that buyers (including Louisiana Pacific) failed to bid on several sales.

The TMP recognizes that further information must be gathered before offering specific timber stands for harvest. Decisions whether to harvest specific sites were based on studies of the tracts offered for sale as well as existing land use plans and guidelines.

Limitations on harvest objectives resulted from openly-conceived plans, not from new or secret processes. The plan for the Gros Ventre Unit, for example, requires consideration of recreation, wildlife, and watershed as well as timber production.

As approved by the Secretary, the TMP requires consultation with the Wyoming Game and Fish Department before harvesting timber in order to minimize adverse impacts on elk habitat and migration. Thus, the Forest Service properly withdrew certain tracts for additional study. Any delay caused by these studies complied with the TMP as approved by the Secretary.

[5] Assuming that the Forest Service failed to comply with the TMP does not help the plaintiffs. First, the targets set by the TMP are "the *maximum* amount of timber which may be cut from national forest lands." 36 C.F.R. § 221.3(a)(5). Second, the TMP is a policy statement which lacks the force of law.

To carry the "force and effect of law, a rule must have certain substantive characteristics and be the product of certain procedural requisites." *Chrysler Corp. v. Brown*, 441 U.S. 281, 301, 99 S.Ct. 1705, 1717, 60 L.Ed.2d 208 (1979). The central distinction is that between "substantive rules" and "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice." *Id.* (citing 5 U.S.C. § 553(b), (d)). Substantive rules carry the force of statutes enacted by Congress. *Production Tool Corp. v. Employment and Training Admin.*, 688 F.2d 1161 (7th Cir.1982). Interpretive rules and policy statements are not binding and do not foreclose alternate courses of action by the agency. *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C.Cir.1980).

Typically, substantive rules "affect[ ] individual rights and obligations." *Chrysler Corp. v. Brown*, 441 U.S. at 302, 99 S.Ct. at 1718 (quoting *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)). A regulation affecting individual rights and obligations does not necessarily have the weight of law. *Id.* The exercise of rulemaking power also "must be rooted in a grant of such power by the Congress." *Id.* Thus, before regulations have the force and effect of law, a nexus must be established between the regulation and some delegation of legislative authority by Congress. *Id.* at 304, 99 S.Ct. at 1719. The grant of authority need not be specific before the regulation binds the courts. A reviewing court must, however, "reasonably be able to conclude that the grant of authority contemplates the regulations issued." *Id.* at 308, 99 S.Ct. at 1721. Adoption of the regulation also must conform to procedural requirements imposed by Congress. *Id.* at 303, 99 S.Ct. at 1718.

■ Three tests emerge from *Chrysler* for determining whether a regulation has the force and effect of law. The regulation must be a substantive (or "legislative") rule, that is, a regulation which affects individual rights and obligations. The regulation next must derive from legislative authority delegated to the agency by Congress. Finally, the agency must comply with the requirements of the Administrative Procedure Act, 5 U.S.C. § 553(b), (d) (requiring publication in the *Federal Register* of a notice of proposed rulemaking and of the final rule). *Horner v. Jeffrey*, 823 F.2d 1521, 1529 (Fed.Cir.1987); *W.C. v. Bowen*, 807 F.2d 1502, 1504 (9th Cir.1987); *St. Mary's Hosp., Inc. v. Harris*, 604 F.2d 407, 409 (5th Cir.1979).

■ Louisiana Pacific argues strenuously that the TMP affects individual rights and obligations and therefore binds both the Forest Service and the courts. This assumes, however, that the company possesses a right to harvest timber from the Bridger–Teton National Forest. No such right is conferred by statute or regulation. Amendments to the Organic Act not only left timber sales to the Secretary's discretion but also expressly tied the exercise of that discretion to furthering the multiple-use concept. 16 U.S.C. § 472a(a). Nothing in the TMP defines who may harvest timber or under what conditions. The TMP does not give Louisiana Pacific a right to harvest specific volumes of timber in specified locations. It merely sets forth potential harvest levels. Neither the TMP nor the Forest Service's 1988 Timber Sale Program Announcement affect any right possessed or obligation owed by Louisiana Pacific.

Even assuming that the Forest Service has affected individual rights and obli-

gations, it does not follow that the TMP is a substantive rule. *Production Tool Corp. v. Employment and Training Admin., United States Dep't of Labor*, 688 F.2d 1161, 1166 (7th Cir.1982). The plan must also have been promulgated under a delegation of legislative power. *Chrysler Corp. v. Brown*, 441 U.S. at 302, 99 S.Ct. at 1718.

An indirect connection exists between the TMP and a delegation of legislative power. The TMP does not cite any source as authorizing its promulgation. Single resource plans such as the TMP generally flow from the Organic Act. Tr. at 77 (testimony of Mr. Stout). The timber management planning regulations at 36 C.F.R. Part 221 purport to be authorized by the Organic Act and track the Act's language. *Compare* 16 U.S.C. § 475 *with* 36 C.F.R. § 221.3(a)(1). Congress conferred broad discretion on the Secretary of Agriculture to execute all laws affecting public lands reserved under the national forest system. 16 U.S.C. § 472. It can reasonably be concluded that the grant of authority from Congress contemplates the regulations issued at 36 C.F.R. Part 36. *Chrysler Corp. v. Brown*, 441 U.S. at 308, 99 S.Ct. at 1721. This does not imply, however, that Congress intended timber management plans for specific national forests to carry the force of law.

Nor does it mean that timber management plans developed pursuant to the regulations carry the effect of the regulations themselves. In *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), for example, the Court found that the regulation at issue affected individual rights but had not been adopted in compliance with the APA and therefore treated the regulations as a non-binding interpretive rule. *Id.* at 236–37, 94 S.Ct. at 1075. In this case, the TMP was not published in compliance with the APA and therefore cannot have the effect of law. *Id.* 441 U.S. at 303, 315, 99 S.Ct. at 1718, 1724.

The TMP is instead a general statement of policy. 5 U.S.C. § 553(d)(2). The APA does not define the term "general statements of policy." The courts have used two criteria to decide whether an agency pronouncement is a policy statement. A policy statement operates only prospectively, announcing factors that an agency will consider in resolving future questions. *Burroughs Wellcome Co. v. Schweiker*, 649 F.2d 221, 224 (4th Cir.1981). Second, statements of policy leave the agency free to exercise its discretion and do not establish binding norms. They do not finally determine the issues or rights addressed. *Id.*

Further guidance can be obtained from the definitions contained in the *Attorney General's Manual on the Administrative Procedure Act* (1947). *Chrysler Corp. v. Brown*, 441 U.S. at 302 n. 31, 99 S.Ct. at 1718 n. 31. The manual defines substantive rules as those which "implement" a statute. In contrast, interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." General statements of policy are "issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power." *Attorney General's Manual on the Administrative Procedure Act* (1947) at 30 n. 3 (quoted in *Chrysler Corp. v. Brown*, 441 U.S. at 302 n. 31, 99 S.Ct. at 1718 n. 31).

All of these factors demonstrate that the TMP is a policy statement rather than a substantive rule. The TMP is clearly prospective in its reach, outlining potential harvest levels for the ensuing decade. It also identifies factors (such as forest conditions, silvicultural practices, market conditions and other uses) involved in resolving future timber management issues. Further, the TMP does not establish a binding norm. It leaves the Forest Service free to exercise its discretion. The Forward to the plan explicitly cautions that "this is an interim plan which will require revision as new information and requirements are developed." Similarly, timber management plans "are constantly being reviewed, revised and updated in light of new decisions made at other planning levels and changes in the resource base." TMP, EIS at i. Both prongs of the test outlined in *Burroughs Wellcome Co. v. Schweiker*, 649

F.2d 221 (4th Cir.1981), have been met. In addition, the TMP was designed to inform the public prospectively of the manner in which the Forest Service proposed to exercise its discretionary powers of managing timber in the Bridger–Teton National Forest. *See, e.g.,* Timber Management Plan at 1 ("The primary purpose of this plan is to provide broad timber management program direction"). It therefore falls within the definition provided by the Attorney General.

The Chief of the Forest Service examined this issue in an appeal arising out of the Klamath National Forest. The Chief refused to order additional harvests in that forest. He reasoned that the Timber Management Plan merely provides an estimate of potential yield which is constrained by the costs of timber sales as well as budgetary constraints imposed by Congress. The Chief also concluded that a NEPA statement is not required when agency action does not change a Timber Management Plan nor alter the potential yield, but simply reflects the Forest's capacity to produce timber under existing restrictions. The Chief's interpretation of existing timber management plans and of the statutes governing them is entitled to considerable deference. *Northwest Central Pipeline Co. v. FERC,* 797 F.2d 918, 920 (10th Cir.1986); *Knutzen v. Eben Ezer Lutheran Housing,* 815 F.2d 1343, 1349 (10th Cir.1987).

Plaintiffs correctly point out that the TMP provides "the overall management direction and objectives for timber management activities." TMP at 66. The Secretary's regulations help determine the meaning of this phrase. "Management direction" is defined as a "statement of multiple-use and other goals and objectives ... and standards and guidelines for achieving them." 36 C.R.F. § 219.3. A "goal" is a concise statement that describes a desired condition to be achieved sometime in the future. It is normally expressed in general terms and has no specific date by which it is to be completed. Goals form the basis from which objectives are developed. *Id.* The TMP clearly describes itself in terms indicating that the empirical results stated in the plan are goals. Perhaps the timber sales program levels projected in Table 9–1 are objectives. An objective is a "concise, time-specific statement of measurable planned results that respond to pre-established goals." *Id.* This does not help plaintiffs, however, because by definition an objective "forms the basis for further planning to define the precise steps to be taken and the resources to be used in achieving identified goals." *Id.* The TMP itself thus supports the conclusion that it states general policy.

Finally, giving the TMP the immutable force of law would frustrate effective timber management. Using the plaintiff's reasoning, the Forest Service, bound by the harvest levels stated in the TMP, would lack the discretion to harvest more timber than projected in the plan if, for example, disease or infestation seriously threatened the health of the forest. This result would defeat sound timber management as well as the intent of Congress. The Court thus concludes that the TMP is not a substantive rule having the force and effect of law but is rather a general statement of policy intended to guide timber harvesting pending completion of the forest plan required by NFMA.

■ Plaintiffs next assert that the Forest Service violated the public participation requirements of the Forest and Rangelands Renewable Resources Planning Act ("RPA"), 16 U.S.C. §§ 1601–1604, the NFMA, 16 U.S.C. §§ 1600–1614, the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–4370, as well as the requirements of the Wyoming Wilderness Act of 1984, Pub.L. No. 98–550, 98th Cong., 2d Sess. (1984), *reprinted in* 1984 U.S. Code Cong. & Admin.News (98 Stat.) 2807. Each claim rests on an assertion that the Forest Service has implemented a secret, ad hoc plan limiting timber harvests in the Bridger–Teton National Forest. These claims are unconvincing. Plaintiffs failed to adduce any evidence, other than guesswork and speculation, that the Forest Service departed from the TMP and secretly plans to drive timber compa-

nies out of the Bridger–Teton National Forest. Further, the claims lack legal support.

In addition to planning on the national level, *see* 16 U.S.C. §§ 1601(a), (b), 1602, 1606(c) (requiring the Forest Service as well as the President to prepare and submit certain planning documents at specified intervals), the RPA mandates development and maintenance of resource management unit plans in the national forests. 16 U.S.C. §§ 1604(a). Regulations adopted under the RPA impose rigorous public participation guidelines, including steps required by NEPA. 36 C.F.R. § 219.6(a). NEPA in turn requires an environmental impact statement for any "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Plaintiffs contend that the Forest Service, without preparing an environmental impact statement, adopted new management objectives and policies resulting in a forty percent reduction in the planned timber harvest. They conclude that the reduction seriously jeopardizes the environment of the area in general and the Louisiana–Pacific Dubois sawmill in particular and thus requires an environmental impact statement. *American Timber v. Bergland*, 473 F.Supp. 310 (D.Mont.1979).

The defendants have not violated the public participation requirements of NEPA or the RPA. No substantial evidence supports the plaintiffs' assertions of a secret timber management plan in the Bridger–Teton National Forest. The decision in *American Timber Co. v. Bergland*, 473 F.Supp. 310 (D.Mont.1979), is inapposite. In that case, the court held that an environmental impact statement accompanying a revised timber management plan was inadequate because it failed to consider the impact on timber harvests. In this case, the Forest Service is complying with the TMP for the Bridger–Teton National Forest and there is no need to revise the TMP or to prepare an environmental impact statement.

The Forest Service also has complied with NFMA. NFMA directs the Forest Service to develop integrated land and resource management plans for each national forest and establishes procedures, including public hearings, "to give federal state and local governments and the public adequate notice and opportunity to comment upon the formulation of standards, criteria and guidelines applicable to the Forest Service programs." 16 U.S.C. §§ 1604, 1612. The management system so established is intended to coordinate all the multiple uses and sustained yield of products and services from the national forest system. 16 U.S.C. § 1604(e)(1). The agency must attempt to complete the process by 1985. 16 U.S.C. § 1604(c). NFMA expressly provides, however, that until land and resource management plans are completed, "the Forest Service may continue under existing land and resource management plans." 16 U.S.C. § 1604(c). The evidence in this case indicates that the Forest Service is managing the Bridger–Teton National Forest under existing resource plans. To the extent the TMP conflicts with the requirements of NFMA, Congress allowed the Forest Service to depart from existing resource plans, as evidenced by language indicating that the Forest Service *"may* continue" under existing plans.

The Wyoming Wilderness Act, Pub.L. No. 98–550, 98th Cong.2d Sess. (1984), superficially appears to limit this discretion. The Act, *inter alia*, adds additional wilderness area, withdraws all mineral activity in those areas (subject to existing leases), designates specific wilderness study areas, and releases acreage considered in RARE II to multiple use. Wyoming Wilderness Act of 1984, §§ 201(a), 203, 301(a), 401. The Act provides that:

> areas in the State of Wyoming reviewed in such final environmental statement or referred to in subsection (d) and not designated wilderness or wilderness study upon enactment of this Act shall be managed for multiple use in accordance with land management plans pursuant to section 6 of the Forest and Rangeland Renewable Resource Planning Act of 1974 as amended by the National Forest Management Act of 1976.

*Id.* § 403(b)(3). The Act thus appears to require the Forest Service to administer national forests under existing land

management plans. A closer reading dispels this notion.

■ The Act states that "areas in the State of Wyoming ... not designated wilderness or wilderness study ... shall be managed for multiple use in accordance with land management plans *pursuant to section 6 of the Forest and Rangeland Renewable Resource Planning Act of 1974 as amended by the National Forest Management Act of 1976."* *Id.* (emphasis added). Section 6 of the Forest and Rangeland Renewable Resource Planning Act of 1974 provides in relevant part that "[u]ntil such time as a unit of the National Forest System is managed under plans developed in accordance with this subchapter, the management of such unit may continue under existing land and resource management plans." 16 U.S.C. § 1604(c). The Wyoming Wilderness Act thus preserves the discretion of the Forest Service to depart from existing resource plans.

The Court concludes that the defendants complied with all applicable statutes and regulations. Accordingly, plaintiffs' eventual success on the merits is insufficiently likely to warrant the issuance of a preliminary injunction.

### C. Balance of Hardships

■ The balance of hardships favors the Forest Service. Plaintiffs argue that they will suffer permanent injury if the injunction does not issue and the Dubois sawmill closes. The mill has closed many times and, despite judicial attempts to intervene, is likely to close again.

Substantial harm would result from granting plaintiffs the relief they request. The Forest Service will be forced to divert personnel and resources from preparation of the forest plan required by NFMA and to cut back services in the Bridger–Teton National Forest. Tr. at 190 (testimony of Mr. Stout). Tourism, recreation, ranchers, and small loggers will be harmed. Finally, increased timber harvesting may have unforeseen environmental effects. This damage tips the balance of equities in favor of the Forest Service. *Amoco Prod. Co. v. Village of Gambell,* —— U.S. ——, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987). Court-ordered timber harvests could cause more harm than closure of the mill.

### D. Injury to the Public Interest

■ The public interest will be harmed if an injunction issues. That interest is better served by following existing forest management practices. Issuing the injunction, in contrast, would upset the careful structure of forest planning crafted by Congress.

Congress wanted decisions affecting the national forests to consider all forest resources. Congress delegated to the Forest Service discretion to balance the use of these resources. 16 U.S.C. § 1600(1), (2), (6). Ordering the Forest Service to make timber available for harvest without considering all relevant factors would frustrate the intent of Congress.

Accepting the plaintiffs' position would have the anomalous result of reducing public participation in the forest planning process. Needed resources would be diverted from completion of the forest management plan. Substantial harm would result with no corresponding assurance of helping the plaintiffs. In all likelihood, sufficient volumes of timber cannot be harvested in sufficient time to prevent temporary closure of the Dubois mill. Issuing the preliminary injunction would be a futile act and merely delay the forest management plan. The forest planning process is an appropriate forum to begin resolving the conflicts over the Bridger–Teton National Forest. The public interest is better served by permitting that process to go forward.

### III. CONCLUSION

The Court finds that the plaintiffs failed to establish irreparable harm and a probability of success on the merits with sufficient certainty to justify issuing a preliminary injunction. The Court also finds that the balance of hardships favors the Forest Service and that issuing the injunction would palpably injure the public interest. It is therefore

ORDERED that the plaintiffs' motion for a preliminary injunction be, and the same hereby is, denied.