The CLINCH COALITION,
et al., Plaintiffs,

v.

William E. DAMON Jr.,
et al., Defendants.

No. CIV.A.2:02 CV 00212.

United States District Court,
W.D. Virginia.
Big Stone Gap Division.

May 6, 2004.

David W. Carr, Jr., Charlottesville, VA, Douglas A. Ruley, Marty Bergoffen, Asheville, NC, for Plaintiffs.

Gail Orendorff, Federal Aviation Administration, Thomas L. Sansonetti, United States Department of Justice, Barbara A. Miller, William P. Horn, Birch Horton Bittner & Cherot, Washington, DC, Julie C. Dudley, United States Attorneys Office, Roanoke, VA, Matthew Tilden, United States Department of Agriculture, Office of General Counsel, Atlanta, GA, Wade W. Massie, Penn Stuart & Eskridge, Abingdon, VA, for Defendants.

### Memorandum Opinion

GLEN M. WILLIAMS, Senior District Judge.

This case involves the claims of the Clinch Coalition, the Virginia Forest Service Watch, the Wilderness Society and the Southern Appalachian Biodiversity Project, (hereinafter, "Plaintiffs"), against William E. Damon, Jr., being sued in his official capacity as the Forest Supervisor for the Virginia National Forests, and the United States Forest Service, (hereinafter, "Defendants"), as defendants, and the Ruffed Grouse Society, Joseph Hobbs and

Gregory Isenberg, (hereinafter, "Intervenors"), as defendant intervenors. The Plaintiffs seek a declaratory judgment that the Defendants have violated the National Environmental Policy Act, (hereinafter, "NEPA"), and the National Forest Management Act, (hereinafter, "NFMA"), by preparing an inadequate Environmental Analysis for the Bark Camp timber sale, (hereinafter, "EA"), by failing to supplement this EA in light of significant new information and changed circumstances and by failing to analyze adequately the economic impacts and net present benefits of this timber sale. (Complaint for Declaratory and Injunctive Relief, (hereinafter, "Complaint"), Docket Item No. 1, at 14.) The Plaintiffs also seek appropriate injunctive relief to insure that the Defendants comply with NEPA and NFMA, and specifically to insure that the Defendants take no further actions toward implementing this timber sale until they have complied with these laws. (Complaint at 14.) The Plaintiffs wish this court to order that the Defendants' Finding of No Significant Impact, (hereinafter, "FONSI"), and Decision Notes concerning this project be vacated, that this court award the Plaintiffs the costs of this action, including reasonable attorneys' fees and expert witnesses' fees and that this court grant such other relief as this court deems just and proper. (Complaint at 14.) This matter is before this court on a Motion for Summary Judgment filed by the Plaintiffs, (Docket Item No. 22), a Motion for Summary Judgment filed by the Defendants, (Docket Item No. 35), and a Motion for Summary Judgment filed by the Intervenors, (Docket Item No. 34.). This court exercises federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Administrative Procedures Act, (hereinafter, "APA"), 28 U.S.C. §§ 701–06. Oral argument was held on

this matter before this court on January 22, 2004, and this case is now ripe for decision. For the reasons set forth below, the Motion for Summary Judgment filed on behalf of the Defendants is hereby **GRANTED**; the Motion for Summary Judgment filed on behalf of the Intervenors is hereby **GRANTED**; and the Motion for Summary Judgment filed on behalf of the Plaintiffs is hereby **DENIED**. Therefore, the decision of the United States Forest Service is hereby **UPHELD**.

## I. Procedural History

The Plaintiffs filed the complaint in this matter on December 17, 2002. The Defendants timely filed their answer to this complaint on March 3, 2003. On March 18, 2003, the Ruffed Grouse Society, Joseph Hobbs and Gregory Isenberg filed a Motion to Intervene. A hearing was held on the Motion to Intervene on May 27, 2003, and by Order of this court entered on the same day, the Ruffed Grouse Society, Joseph Hobbs and Gregory Isenberg were added as defendant intervenors. The Intervenors timely filed their answer to the complaint on August 1, 2003.

On July 15, 2003, the Plaintiffs filed their Motion for Summary Judgment. The Intervenors filed their Motion for Summary Judgment on August 18, 2003. The Defendants filed their Motion for Summary Judgment on August 20, 2003. Oral argument was held on these motions on January 22, 2004.

## II. Factual Background

The National Forests in the United States were established by congressional mandate in order to "improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States." 16 U.S.C.A. § 475 (West 2000). In addition,

National Forests were established and are to be "administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C.A. § 528 (West 2000). In 1936, the Jefferson National Forest was created and joined with the George Washington National Forest in 1995. The two Forests include lands that are parts of the Commonwealths of Virginia and Kentucky and the state of West Virginia; altogether, the Forests contain approximately 1.8 million acres of land.

The National Forests are managed under the Land and Resource Management Plan and final Environmental Impact Statement for the Jefferson National Forest, (hereinafter, "Management Plan"). This plan addresses each section of the Forests separately, and it provides a set of goals and management practices unique to each area. The Bark Camp Area, the area at issue in this case, is included in the Clinch Ranger District. The Bark Camp Area consists of the High Knob Tower, Bark Camp Lake, High Knob Lake, the Chief Benge Scout Trail and the Stony and Little Stony Creek Watersheds of the Clinch River. Many rare and endangered species are present in the Clinch River. The Bark Camp Area attracts many visitors because of its recreational opportunities, hunting, fishing, hiking, wildlife and beauty. On a clear day, a visitor to High Knob Tower can observe five states; this particular spot of the Bark Camp Area attracts approximately 40,000 visitors each year. In fact, the Bark Camp Area is the most heavily used area for recreation in the Clinch Ranger District. Many people have made the Bark Camp Area their permanent home, including many of the members of the Clinch Coalition. Since the 1980s, the Bark Camp Area lost hundreds of acres of forest to heavy logging. In fact, a large amount of the Bark Camp Area has undergone clearcutting. Certain sections of the Bark Camp Area, including High Knob, have been developed for the procurement of oil and gas, projects that also have required the removal of many trees.

The Management Plan provides for careful management of the Bark Camp Area, calling for a diverse habitat, elimination of non-native species and providing an adequate healthy habitat for a variety of wildlife. The Bark Camp Area is not currently in conformity with the Management Plan in that it contains too little early successional growth. The Forest Service has estimated that, without a large phenomenon such as a forest fire, the Bark Camp Area will be devoid of early successional habitat sometime in 2004. A forest must contain a full range of habitat in order to support a diverse population of wildlife; however, the forests of Virginia, Kentucky and West Virginia do not contain such a full range of habitat. This includes the Bark Camp Area. As a result, the Forest Service took action to remedy the situation in the Bark Camp Area. This action became known as the Bark Camp Timber Sale Projects.

The project at issue in this litigation has its beginnings in the late 1990s. In September 1997, the Clinch Ranger District of the Jefferson National Forest, which encompasses the Bark Camp Area, began the NEPA process by issuing a scoping notice for public comment on the Bark Camp Timber Sale Projects. Because of the great public interest in this project, the Clinch Ranger District hosted four public consensus meetings in 1999 to elicit further public commentary on how to manage the many resources in the Project area. These public comments were incorporated into the analysis of the proposed Project. Eventually, the Forest Service compiled the original Environmental Assessment, (hereinafter, "EA"), in this case and submitted it to the public for the requisite 30–

day comment period. The Clinch Coalition, Virginia Forest Watch and the Southern Appalachian Biodiversity Project submitted comments or expressed interest in the Project during that 30–day period. As a result of this public commentary, the Forest Service issued a revised EA, the one at issue in this case, in March 2001.

The Bark Camp EA, which is at issue in the present action, was conducted to provide a plan for the management of vegetation in the Bark Camp Area in order to bring that area into compliance with the Management Plan. After a lengthy investigation and public comment period, the Forest Service issued the revised EA, which outlined a plan to improve timber stand through prescribed burning and removing non-native plant species. The revised EA identified eight alternatives and analyzed each alternative. Seven of the alternatives were referred to as "action" alternatives, which proposed harvesting between zero and 1,414 acres of timber. Two of the alternatives were eliminated through detailed studies. Alternative Seven was referred to as a "No Timber Harvest" alternative and included some of the associated projects, but did not include the timber harvest project. Alternative One was the "No Action" alternative that is required by NEPA. In order to accomplish this goal, the Forest Service determined that some tree harvesting must be done.

The Forest Service concluded in the EA that the preferred method to accomplish the goals set out for the Bark Camp Area would include commercial timber harvest on approximately 700 acres. The Project also would include regeneration treatments, removing non-native white pines, balancing age classes, selective harvest to manage stand density and species composition to promote diversity, thinning groups of trees and other circumscribed harvest techniques that benefit a wide va-

riety of wildlife. The Forest Service determined that there was no need for wide scale timber harvesting in the area immediately adjacent to the High Knob Tower, and that the area closest to High Knob Tower needed only single tree selection harvesting.

As part of developing the EA, the Forest Service considered the potential impacts on water and fisheries in the watersheds. The EA examined each of the waterways involved, including the then current gradient, Riffle stability rating, habitat units, cobble embeddedness and other factors that affect the health of each waterway. In addition, the EA discussed the effects of sedimentation on the health of a waterway. By using a sediment modeling formula, the Forest Service then estimated the amount of sediment that would be added to each waterway in the watershed by the various proposals set forth in the EA. The Forest Service commented that the sediment modeling formula utilized was the "worst case scenario" and was a highly unlikely outcome because this sediment modeling formula assumed that all the sediment from the Project would enter the waterways within the first year of the project. The Forest Service determined that each proposed action would fall within the percentage increase range to sedimentation that occurs naturally every year in the absence of human interference.

Even though the Forest Service determined that the increase in sedimentation would fall within the range that occurs naturally every year, it included a number of mitigation measures in an effort to minimize the sedimentation even further. Examples of these mitigation measures included: stabilization of disturbed soils through vegetation to prevent erosion and use of "filter strips" to trap sediment.

The Forest Service also included associated projects such as the Large Woody Debris Program. The Large Woody Debris Program involved felling trees in particular waterways to provide a barrier against the downward flow of sediment to particular areas. The Forest Service also determined that the Large Woody Debris Program would help with fish habitat, increase nutrients in the water, create habitat complexity and promote stream diversity. The Forest Service concluded that the Large Woody Debris Program was to be utilized in only the areas that lacked this type of debris and would benefit from the incorporation of additional woody debris.

The EA also discussed the economic impacts of the Project, both qualitatively and quantitatively. The EA included a discussion of the costs and revenues of the project planning and timber harvest activities associated with each alternative proposed by the Forest Service. The EA also concluded that the Project would at first negatively impact recreational use; however, the Project eventually would benefit recreational uses through, among other things, improvement of the view from the High Knob Tower and improvement of access for dispersed recreational pursuits. The EA also discussed several other economic impacts as well.

After this analysis, the EA concluded that the Project would not result in significant impacts. As a result, on May 21, 2001, Forest Supervisor William E. Damon, Jr. issued a Decision Notice and Finding of No Significant Impact, (hereinafter, "FONSI"), for the Bark Camp Timber Sales Project. The Decision Notice approved Alternative Eight, which included commercial timber harvesting and associated road system development, as well as eleven sale area improvement projects. This Alternative also proposed the implementation of timber harvesting on approximately 700 acres utilizing clearcutting, 2–age modified shelterwood, ruffed grouse habitat improvement, crop tree release, group selection and single tree selection. This Decision Notice was published on May 24, 2001, which began the requisite 45–day appeal period.

Subsequent to the issuance of the EA and its adoption in a FONSI, a severe storm produced massive flooding in many areas of the Bark Camp Area. Because of the great magnitude of the flooding that occurred in the Bark Camp Area, the Forest Service instigated an investigation of the effects of this flooding on the proposed Project. As part of this investigation, the Forest Service enlisted the expertise of scientists at the Virginia Polytechnic Institute and State University, (hereinafter, "Virginia Tech"). The Forest Service, thus, placed the project on hold until the effects of the floods could be assessed.

The Forest Service conducted this investigation over the next year. The Forest Service determined that one of the most significant impacts of the floods was several landslides in different areas of the Jefferson and Washington National Forests. This analysis involved a real reconnaissance of the entire area utilizing a helicopter and ground level reconnaissance on foot; through these activities, the Forest Service mapped the occurrence of landslides in the watersheds. This reconnaissance revealed that some landslides had occurred in the watershed on the steeper slopes near Stony Creek; however, it also revealed no active landslides in the Bark Camp harvest area.

Dr. J.M. Rein Visser, a scientist at Virginia Tech, was consulted to further examine the issue of landslides in the Project area. Dr. Visser concluded that the logging and other activities that had taken place in the past had not increased the

occurrence of landslides in that particular area.

It was also determined that the floods affected the waterways as well, changing the characteristics of certain areas of the waterways. The Forest Service investigated the characteristics of the waterways, including measuring the large woody debris in the waterways, the large woody debris' placement and the water conditions. This investigation also inspected the sediment, cobble, boulders and debris movement in the waterways that was caused by the storm. After this investigation, the Forest Service determined that the floods created debris dams in certain areas, moved boulders, created large woody debris, scoured some areas and moved sediment. The Forest Service then compared the conditions of the streams in 1997, 2001 and 2002.

In order to further ascertain the many impacts the floods possibly had on the Project area, the Forest Service then participated in an Advisory Committee. The Advisory Committee was made up of United States Congressman Rick Boucher and a member of his staff, the Mayor of the Town of Dungannon and representatives from the Forest Service, the Clinch Coalition, the Nature Conservancy, the U.S. Fish and Wildlife Service, the U.S. Army Corps of Engineers and a local tourism organization. This Committee reviewed scientific data, presentations on the data collected by the Forest Service as well as independent scientists and developed and reviewed economic analysis reports and information. The Advisory Committee made recommendations, which included the following: (1) to designate the Bark Camp Area as a National Recreational Area and (2) to discontinue the Large Woody Debris Program.

After this analysis process, the Forest Service's scientists reviewed all the data

and evidence compiled both before and after the floods and concluded that (1) the streams in the Project area were still capable of supporting instream beneficial uses after the flood; (2) the sediment deposited in the streams during the flood did not individually or cumulatively significantly impact the streams and their instream beneficial uses, including fish; (3) the Bark Camp Project did not significantly increase the potential for future debris slides; and (4) the increase in flood level that the Bark Camp Project would cause would be immeasurable and did not create a cumulative significant impact. In coming to these conclusions, the Forest Service discussed each stream and the impact on each stream individually.

As a result, on September 23, 2002, Forest Supervisor William E. Damon, Jr., issued an Amended Decision Notice and an Amended FONSI for the Bark Camp Project. This Decision Notice decided that the Forest Service should (1) drop the Large Woody Debris Program in accordance with the recommendations of the Advisory Committee as well as the additional survey work in the area, (2) refrain from harvesting in harvest units 2058–14, comprising 12 acres, and 2058–19, comprising 10 acres, in the Stony Creek drainage, and (3) refrain from harvesting harvest areas in the Stony Creek drainage that had a greater than moderate risk of debris slides. The Forest Service explained that it would continue with the Project because the original reasons for the Project still remained: the lack of early successional habitat and the impact such deficiency had on the Forests' health and wildlife. Even though the Forest Service decided to amend the decision, it determined that the EA for the project did not have to be corrected, supplemented or revised.

The Amended Decision and the Amended FONSI were published on September

26, 2002, which began the requisite 45–day appeal period. Soon after the Amended Decision and the Amended FONSI were issued, they were appealed by the Clinch Coalition, the other Plaintiffs, and others. During preparation of their appeal, the Plaintiffs discovered an error in the Forest Service's calculations concerning the sediment delivery for Joel Branch Creek. The original calculation provided by the Forest Service was that the sediment increase to Joel Branch Creek would be 9.7%, which was very close to the 10% guideline set forth by the Forest Service in the EA. In fact, the projected sediment increase to Joel Branch Creek will be 15.5%, which is above the 10% guideline included in the EA. The Forest Service examined the impact of this error on its assessment, and the Forest Service concluded that even the corrected amount of 15.5% fell within the natural variance of sediment delivery in the waterway. As a result, the Forest Service concluded that the error in the Joel Branch Creek calculation did not affect the FONSI, and the Forest Service did not issue a supplemental EA or Environmental Impact Statement, (hereinafter, "EIS").

The Plaintiffs then filed their action in this court.

### III. Analysis

The standard of review for a motion for summary judgment is well-settled; the court should grant summary judgment only when the pleadings, responses to discovery and record reveal that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir.1990) (en banc), cert. denied, 498 U.S. 1109, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991); Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir.1985). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from those facts in the light most favorable to the party opposing the motion. See Anderson, 477 U.S. at 255, 106 S.Ct. 2505; Matsushita, 475 U.S. at 587–88, 106 S.Ct. 1348; Nguyen v. CNA Corp., 44 F.3d 234, 237 (4th Cir.1995); Miltier v. Beorn, 896 F.2d 848, 850 (4th Cir.1990); Ross, 759 F.2d at 364–65; Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir.1980). In other words, the nonmoving party is entitled to have "the credibility of his evidence as forecast assumed." Miller, 913 F.2d at 1087 (quoting Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir.1979)). Therefore, in considering cross motions for summary judgment, the court must consider the facts in the light most favorable to all parties.

The complaint in this case alleges that the Defendants' approval of the Bark Camp Timber Sale violates NEPA and APA. Specifically, the first claim of the complaint alleges that the Defendants violated NEPA by failing to supplement the EA in light of changed circumstances and significant new information. The second claim of the complaint alleges that the Defendants violated NEPA and APA by failure to adequately assess the impacts to water quality. The third claim of the complaint alleges that the Defendants violated NEPA by failing to adequately evaluate

cumulative effects from past, present and reasonably foreseeable future actions on public and private lands. The fourth, and final, claim of the complaint alleges that the Defendants violated NFMA by not adequately analyzing the economic issues involved. The Plaintiff seeks a declaratory judgment that the Defendants violated NEPA, APA and NFMA by preparing an inadequate EA for the Bark Camp Timber Sale, by failing to supplement the EA in light of significant new information and changed circumstances and by failing to analyze adequately the economic impacts and net present benefits of this timber sale. The Plaintiffs also pray that this court will issue appropriate injunctive relief to insure that the Defendants comply with NEPA and NFMA, and specifically to insure that the Defendants take no further actions toward implementing this timber sale until they have complied with these laws. The Plaintiffs also wish this court to order that the Defendants' FONSI and Decision Notes regarding the project be vacated. Plaintiffs are also seeking the costs of this action, including reasonable attorneys' fees and expert witnesses' fees.

■■■ NEPA requires that an agency take a "hard look" at a proposal's environmental consequences before deciding to take action. *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989); *Hodges v. Abraham,* 300 F.3d 432, 438 (4th Cir.2002); *Hughes River Watershed Conservancy,* (hereinafter, *Hughes River I* ), *v. Glickman,* 81 F.3d 437, 443 (4th Cir.1996). If it is determined that the agency took the requisite "hard look," this court must defer to the agency's decisions unless those decisions are arbitrary and capricious. *Hodges,* 300 F.3d at 436; *Hughes River I,* 81 F.3d at 443. Additionally, "once [an agency] has taken such a look, the agency is not obligated to choose any

particular course of action. . . . Moreover, if the agency has taken the required 'hard look,' [the court] must defer to it unless [the agency's] decisions were arbitrary or capricious." *Hodges,* 300 F.3d at 446 (internal citations omitted). As a result, an agency's decision that a particular action or actions will not have a significant impact, and that, therefore, no EIS is required will be upheld by this court unless such decision is arbitrary and capricious. *Webb v. Gorsuch,* 699 F.2d 157, 159 (4th Cir.1983); *Providence Rd. Cmty Ass'n v. EPA,* 683 F.2d 80, 82 (4th Cir.1982); *Citizens Against the Refinery's Effects,* (hereinafter, *"CARE"* ), *v. U.S. EPA,* 643 F.2d 178, 181–83 (4th Cir.1981). In addition, an agency's decision whether a supplemental NEPA document is required under the circumstances is also reviewed under the arbitrary and capricious standard. *See Marsh v. Or. Natural Resources Council,* 490 U.S. 360, 374, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

NEPA requires that a federal agency follow certain procedures when an agency is implementing projects that will have an impact on the environment. *Robertson,* 490 U.S. at 350, 109 S.Ct. 1835; *Hughes River I,* 81 F.3d at 443. Specifically, NEPA requires that an agency, in deciding how to implement such projects, must prepare a "detailed statement" of the impacts of such projects. 42 U.S.C.A. § 4332(2)(C) (West 2003). Such a statement is to include:

> (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the

proposed action should it be implemented."

42 U.S.C.A. § 4332(2)(C)(i)-(v) (West 2003). An agency can accomplish this detailed statement through an EA or an EIS. If there is uncertainty as to whether the proposed action will significantly impact the environment, then an agency is required to conduct an EA, and if the agency makes a FONSI, then an EIS is not required. *See* 40 C.F.R. § 1501.4(b), (c), (e) (2003).

## A. The 10% "Threshold" and the Error in Calculation for Joel Branch Creek

The Plaintiffs assert that the Forest Service arbitrarily contradicted its own EA in asserting that the level of sediment that the Bark Camp Timber Sale will cause in Joel Branch Creek is inconsequential. (Plaintiffs' Memorandum in Support of Motion for Summary Judgment, (hereinafter, "Plaintiffs' Brief"), Docket Item No. 23, at 15.) The Plaintiffs assert that the Forest Service acknowledged that the streams in the Bark Camp Area are already loaded with sediment, which is a cause for concern. (Plaintiffs' Brief at 15.) The Plaintiffs argue that the Forest Service's EA acknowledged this concern and concluded that:

> A 10% increase in sediment is within the range of natural variability of these systems, but without mitigation, will serve to retard hydrologic recovery and achievement of the desired future condition of dynamic equilibrium and aquatic ecological integrity.

(Plaintiffs' Brief at 16); (Administrative Record, (hereinafter, "A.R."), 283, at 81; AR, 174, at 8.)[1] The Plaintiffs further argue that the 10% increase in sediment

should be construed as a "threshold," because of such language utilized in the EA. (Plaintiffs' Brief at 16.)

■ However, upon review of the EA as a whole, this court is of the opinion that the 10% "threshold" to which the Plaintiffs refer was never intended to have the meaning that the Plaintiffs attempt to assign to it. The Defendants acknowledge that the EA states that "inventory data for the stream channels in the Bark Camp area ... indicates that they currently have excess sediment. Based on this information, a sediment yield increase threshold of 10 percent was established." (A.R., 283, at 79.) Looking beyond this specific language utilized in one part of the EA, this court is able to ascertain that the Forest Service was not referring to the 10% number as a significance threshold, but that it was utilizing this as a more of a guideline. In Table 17 of the EA, the Forest Service identified the percentage increase in sediment yield over existing conditions in each stream that the different proposed alternatives would cause. (*See* A.R., 283, at 80.) This Table reveals that 10% is the highest approximate level of anticipated sediment change in any of the streams in the Project Area. (A.R., 283, at 80.) The Plaintiffs' argument that 10% was a significance threshold is rebutted by the fact that several of the alternatives entertained by the Forest Service in the EA would have resulted in a greater than 10% sediment yield gain in certain streams, and that the Forest Service concluded in the EA that "[a]ll alternatives would meet Forest Plan direction and project area conditions for water quality." (A.R., 283, at 83.) Therefore, if 10% was meant to be construed as a significance threshold, then many of the alternatives would not meet the Forest

---

**1.** When the court cites the Administrative Record in this case it will cite to it as follows: A.R., for Administrative Record, followed by the tab number of the particular document cited, followed by the specific page number.

Plan direction because they would cause a greater than 10% sediment yield increase. However, the Forest Service, after a thorough investigation, concluded that these alternatives were still viable alternatives.

Subsequent to the publication and adoption of the EA, the Forest Service was informed that its calculations for Joel Branch Creek were inaccurate, in that the sediment yield increase in Joel Branch Creek would be 15.5%, which is greater than the 10% "threshold" referred to in the EA. The Plaintiffs argue that the Forest Service's actions to proceed with the Bark Camp Timber Sale was arbitrary and capricious because that action ignored "the agency's own establishment of the 10% threshold in the EA." (Plaintiffs' Brief at 17.) Further, the Plaintiffs argue that if the Forest Service wants to revise its EA, rewrite its analysis of sediment impacts, and to set a new "threshold," then NEPA requires that the Forest Service make the allegedly new information and rewritten analysis available for public comment and for scientific review and criticism. (Plaintiff's Brief at 17.) Essentially, the Plaintiffs are arguing that the Forest Service erred when it determined that no other NEPA documentation was required.

■ A supplemental NEPA document, either an EA or an EIS, is required if new information "present[s] a seriously different picture of the environmental impact of the proposed project from what was previously envisioned." *Hughes River I*, 81 F.3d at 443 (quoting *Hickory Neighborhood Defense League v. Skinner*, 893 F.2d 58, 63 (4th Cir.1990)). This court must utilize the arbitrary and capricious standard in reviewing an agency's decision whether new information requires a supplemental NEPA documentation. *See Marsh*, 490 U.S. at 374, 109 S.Ct. 1851. The inquiry into whether new information requires NEPA supplemental documentation does not require additional NEPA documentation itself; the agency is required to take a requisite hard look at the issue. *Hodges*, 300 F.3d at 446.

This court notes that this argument of the Plaintiffs rests on the Plaintiffs' construction of the 10% increase in sediment yield as a "threshold." However, as stated earlier, a reading of the EA as a whole does not support this conclusion. Even so, this court will now address the Plaintiffs' argument with regard to this matter.

■ When the Forest Service was notified of its error, the Forest Service instituted an investigation into the effect of this error on its Original FONSI. (A.R., 419.) The Forest Service subsequently determined that their initial calculation for Joel Branch Creek under Alternative 8 that indicated a 9.7% increase in sediment yield was, in fact, incorrect, and that the actual percentage increase in sediment yield for Joel Branch Creek was 15.5%. (A.R., 419, at 1.) The Forest Service then concluded that the 15.5% increase in sediment yield still fell within the natural variance of sediment delivery in Joel Branch Creek. (A.R., 419, at 3.) Based on the fact that the Forest Service's Original FONSI was based greatly on the Forest Service's determination that the increases caused by the Project would fall within the natural variance, the Forest Service determined that the error in the Joel Branch Creek calculation would not affect the FONSI because 15.5% was found to still be within the natural variance. (A.R., 419, at 3.) Because there was no change in the assessment of impacts, no new EA was necessary. *See Hughes River I*, 81 F.3d at 446. The Forest Service took the required "hard look" into whether the error with regard to the sediment yield increase in Joel Branch Creek would require further NEPA documentation. Therefore, because the Forest Service took the required

"hard look" and determined that the additional sediment that would be delivered to Joel Branch Creek was still within the natural variance for that waterway, this court cannot find the actions of the Forest Service with regard to its decision not to develop a supplemental EA to be arbitrary and capricious.

This court further finds that the error regarding the percent of sediment increase for Joel Branch Creek under the specific alternative at issue in this case was harmless. Under the APA, this court is required to review final actions of agencies, including the Forest Service, under "the rule of prejudicial error." 5 U.S.C.A. § 706 (West 1996). "[A] mistake that has no bearing on the ultimate decision or causes no prejudice shall not be the basis for reversing an agency's determination." *Sierra Club v. Slater*, 120 F.3d 623, 637 (6th Cir.1997) (citing *Blackman v. Busey*, 938 F.2d 659, 664 (6th Cir.1991)). The Plaintiffs do not assert that the Forest Service's calculation of the total volume of sediment that would be introduced into each stream under each alternative listed in Table 16 is incorrect. The Plaintiffs only assert that the error in calculation involved the percentage sediment yield increase of one stream in one alternative presented in the EA. The Plaintiffs assert that this error would result in a significant impact. Given the fact that the Forest Service took the required "hard look" into the issue and the court's earlier finding that the 10% increase in sediment yield was only a guideline and not a threshold, this court finds that this mistake in calculation was not prejudicial and would not have a bearing on the ultimate decision; therefore, this error was harmless.

## B. The EA's Economic Analysis

The Plaintiffs next assert that "[i]n authorizing the Bark Camp timber sale, the Forest Service failed to account for the significant economic value associated with clean water, wildlife, recreation, scenery, non-timber forest products, and other non-priced 'ecosystem services' generated by the Bark Camp timber sale area in its existing condition." (Plaintiffs' Brief at 27–28.) In addition, the Plaintiffs assert that the Forest Service failed to account for the reduction in these economic values, which will result from logging and road building. (Plaintiffs' Brief at 28.) Therefore, the Plaintiffs argue that the economic analysis provided by the Forest Service in the EA used to justify the Bark Camp timber sale was inadequate under NFMA and NEPA. (Plaintiffs' Brief at 28.) This claim of the Plaintiffs fails as well.

The Plaintiffs rely on the following to support their contention that the EA's economic analysis was inadequate: the Multiple–Use Sustained–Yield Act, (hereinafter, "MUSYA"), the Forest and Rangeland Renewable Resources Planning Act, (hereinafter, "FRRRPA"), NFMA, NEPA, the regulations that implemented those statutes, the Forest Service's Manual and Handbook and case law. (Plaintiffs' Brief at 28–36.) This court will now address each of these in turn; however, as will be evident from the discussion of each, Plaintiffs' reliance on each is misplaced.

### 1. MUSYA

The Plaintiffs argue that, under MUSYA, the Forest Service is required to manage the National Forests for multiple use, and that MUSYA defines multiple use as "[t]he management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people[.]" 16 U.S.C.A. § 531 (West 2000). This language, however, is far from being a directive by Congress that the Forest Service must utilize

a specific economic analysis, let alone the one Plaintiffs assert is required.

■ Plaintiffs also assert that under 16 U.S.C. §§ 529, 1602 and 1604 and 42 U.S.C. § 4332 Congress has mandated that the Forest Service provide an accounting of "all costs and all benefits before any particular tract of national forest land is allocated to a specific use such as a timber sale." (Plaintiffs' Brief at 31.) However, Plaintiffs misread 16 U.S.C. § 529. This provision requires only that the Forest Service give "due consideration" to the "relative values of the various resources in particular areas." 16 U.S.C.A. § 529 (West 2000). It says nothing about a particular methodology; therefore, it does not mandate the particular methodology that the Plaintiffs assert the Forest Service should utilize. The same is true of 16 U.S.C. §§ 1602 and 1604 and 42 U.S.C. § 4332. *See* 16 U.S.C.A. §§ 1602, 1604 (West 2000); 42 U.S.C.A. § 4332 (West 2003).

In addition, the particular sections of MUSYA that the Plaintiffs rely upon "contain the most general clauses and phrases" such that these provisions "can hardly be considered concrete limits upon agency discretion." *Perkins v. Bergland*, 608 F.2d 803, 806 (9th Cir.1979.) MUSYA contains no specific mandate that the Forest Service utilize a particular procedure to analyze the economic impacts of a proposed project and its alternatives. The language contained in MUSYA " 'breathes discretion at every pore.' " *Perkins*, 608 F.2d at 806 (quoting *Strickland v. Morton*, 519 F.2d 467, 469 (9th Cir.1975)).

Plaintiffs rely upon *Intermountain Forest Indus. Ass'n v. Lyng*, 683 F.Supp. 1330 (D.Wyo.1988), to support their argument that the Forest Service's EA in this case did not provide an adequate economic analysis. (Plaintiffs' Brief at 31.) Although the court in *Lyng* stated that the Forest Service "must consider the relative values of all resources within the national forests," that court did not state nor did it imply that the Forest Service must conduct the particular quantitative method that Plaintiffs assert is required. *See Lyng*, 683 F.Supp. at 1337.

Therefore, MUSYA fails to support the contentions of the Plaintiffs that the Forest Service is required to utilize a specific economic analysis calculus, let alone the one set forth by the Plaintiffs in their Brief.

### 2. FRRRPA

■ The Plaintiffs also attempt to utilize the provisions of FRRRPA to bolster their claim that the Forest Service's EA at issue in this case was inadequate. Particularly, the Plaintiffs assert that general congressional policy that is established in FRRRPA states that forests on national forest lands should be managed "to secure the maximum benefits of multiple sustained yield management . . . ." (Plaintiffs' Brief at 28, quoting 16 U.S.C.A. § 1601(d)(1) (West 2000 and Supp.2004). FRRRPA does not support the Plaintiffs contentions, however.

In fact, as pointed out by the Defendants in their Brief, (Defendants' Brief at 50), the specific provisions of FRRRPA relied upon by the Plaintiffs are generally designed to provide certain reports to Congress "to help legislators understand when, and to what extent, budget requests were inadequate to fulfill policies approved by Congress." *Nat'l Wildlife Fed'n v. United States*, 626 F.2d 917, 927 and n. 20 (D.C.Cir.1980). FRRRPA contains no clear direction from Congress mandating that the Forest Service gather the information by any particular economic analysis method nor does FRRRPA mandate that the information be utilized in a certain

way. *See* 16 U.S.C.A. § 1600 *et seq* (West 2000 and Supp.2004). Plaintiffs rely on 16 U.S.C. § 1602, for support of their argument that the Forest Service must consider all costs and all benefits; however, that provision does not provide for a particular accounting method either. (Plaintiffs' Brief at 31); *see* 16 U.S.C.A. § 1602 (West 2000). In fact, that particular provision of the Code does not even apply to the development of an EA; it applies to the preparation of particular reports that must be provided to the President of the United States by the Secretary of Agriculture. 16 U.S.C.A. § 1602 (West 2000). Plaintiffs also rely upon 16 U.S.C. § 1604 and 42 U.S.C. § 4332, but those provisions do not provide for a particular methodology either. *See* 16 U.S.C.A. § 1604 (West 2000); 42 U.S.C.A. § 4332 (West 2003). In addition, FRRRPA does not even envision a particular project; it is concerned with the management of all of the National Forests. *See* 16 U.S.C.A. § 1600 *et seq* (West 2000 and Supp.2004).

Consequently, the Plaintiffs' assertion that the EA did not provide an adequate economic analysis is not supported by the language of the FRRRPA.

### 3. NFMA

The Plaintiffs also assert that the EA's environmental analysis is inadequate under NFMA. (Plaintiffs' Brief at 28.) Particularly, the Plaintiffs assert that "Congress has required a complete accounting of *all* costs and *all* benefits before any particular tract of national forest land is allocated to a specific use such as a timber sale." (Plaintiffs' Brief at 31.) In addition, the Plaintiffs cite to various provisions of NFMA, which mandate that the Forest Service develop forest planning regulations that utilize the various multiple uses of the national forests such as range, timber, watershed, wildlife, fish, and recre-

ation, and that Forest Plans must consider " '[t]he expected outputs for the planning periods, including appropriate marketable goods and services, as well as nonmarket items, such as recreation and wilderness use, wildlife and fish, protection and enhancement of soil, water, and air, and preservation of aesthetic and cultural resources values.' " (Plaintiffs' Brief at 31–32.) However, Plaintiffs fail to point to any particular provision of NFMA that mandates a particular methodology, particularly a methodology that quantifies the impact of timber harvesting on non-timber values. The reason they have not provided a particular section is that they are unable to do so, because NFMA does not provide for a particular accounting methodology.

Also, Plaintiffs have failed to check the legislative history of NFMA. The Senate Report concerning NFMA shows that Congress did not envision NFMA as requiring that a monetary value be assigned to non-timber resources because of the imprecision in attempting such an analysis:

> In determining whether certain lands should be managed for timber products, only direct timber production costs and returns should be evaluated. Costs and benefits attributable to other resource values should be excluded because of the lack of certainty involved in assigning values to other benefits derived and the impact on multiple use goals.

*See* S.Rep. No. 94–893 (1976), reprinted in 1976 U.S.C.C.A.N. 6662, 6697.

Given the fact that NFMA does not provide for a particular preferred economic analysis, particularly the quantitative analysis asserted by the Plaintiffs, NFMA does not bolster the Plaintiffs' assertion that the EA's economic analysis was inadequate.

## 4. NEPA

 The Plaintiffs also rely on NEPA to support their argument that the Forest Service is required to quantify in monetary terms all the impacts from timber harvesting for each site-specific project. (Plaintiffs' Brief at 31, 32.) Specifically, the Plaintiffs assert that "[a]ssigning monetary values to all economic impacts of a project also is a necessary step in meeting NEPA's mandate to give presently unquantified environmental amenities and values 'appropriate consideration in decision making.'" (Plaintiffs' Brief at 32, quoting 42 U.S.C. § 4332(B).) Plaintiffs further state that if "there is incomplete information about non-priced benefits and costs," that regulations implementing NEPA mandate the Forest Service to obtain such information or evaluate such impacts based on "'theoretical approaches or research methods generally accepted in the scientific community.'" (Plaintiffs' Brief at 33, quoting 40 C.F.R. § 1502.22.) However, the provision cited by Plaintiffs actually states:

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community....

40 C.F.R. §§ 1502.22(a), 1502.22(b) (2003). This particular regulation section, like many of the others mentioned by the Plaintiffs, does not direct the Forest Service to use a particular economic accounting methodology, especially not the method asserted by Plaintiffs that would require quantification of all non-timber values.

As Defendants note in their Brief, the Plaintiffs ignore certain regulatory provisions that contradict their position. (Defendants' Brief at 57.) In particular, "[f]or purposes of complying with [NEPA], the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations." 40 C.F.R. § 1502.23 (2003). *See also Sierra Club v. Stamm,* 507 F.2d 788, 794 (10th Cir.1974) ("[NEPA] does not require the fixing of a dollar figure to either environmental losses or benefits."); *Trout Unlimited v. Morton,* 509 F.2d 1276, 1286 (9th Cir.1974) (holding that NEPA does not require a "formal and mathematically expressed cost-benefit analysis" because such a calculation would be highly subjective and the final decision is not wholly a mathematical determination); *Environmental Defense Fund, Inc. v. Costle,* 439 F.Supp. 980, 993 (E.D.N.Y. 1977) ("We find no requirement in NEPA for the placement of dollar values on environmental impacts ...."); *Environmental Defense Fund v. Tenn. Valley Authority,*

371 F.Supp. 1004, 1013 (E.D.Tenn.1973), aff'd, 492 F.2d 466 (6th Cir.1974) ("[NEPA does not require an agency] to compute in dollar figures every environmental loss. This section merely requires *methods and procedures* be developed for *appropriate consideration* of presently unquantified amenities, not the development of a procedure of mathematical equivalence as urged by plaintiffs.") (emphasis in original).

To the extent that NEPA does require an economic analysis of a proposed project and its alternatives, the Forest Service complied with such mandate when it included in the EA an economic analysis of the Bark Camp Timber Sale. (*See* A.R., 283 at 190–93.) Also included in the EA is a qualitative analysis of non-timber resources. (*See* A.R., 283 at 152–57); (*see also* A.R., 283 at 161–80.)

Based on the foregoing discussion this court is unable to find that the choice of methodology to determine the non-timber costs and benefits of the proposed project and its alternatives are arbitrary and capricious, and the Plaintiffs have failed to convince the court otherwise. Because NEPA does not require that all costs and benefits be reduced to monetary values, the Forest Service's economic analysis fully complies with NEPA.

## 5. The Forest Service Planning Regulations

The Plaintiffs also assert that the Forest Service's own planning regulations provide clear direction to quantify in monetary terms all benefits and all costs of timber harvesting for Forest Plans as well as each site-specific project. (Plaintiff's Brief at 29, 30, 32, 34.) Specifically, the Plaintiffs rely upon numerous provisions of the regulations under 36 C.F.R. Part 219. (Plaintiffs' Brief at 32.)

The Plaintiffs rely on 36 C.F.R. § 219.12(g) to support their claim that the Forest Service must consider all costs and all benefits, and that the Forest Service must utilize a quantitative methodology in considering the costs and benefits of any particular project. (Plaintiffs' Brief at 32.) However, this particular section was revised before the Revised EA was completed, 65 Fed.Reg. 67514, 67572 (Nov. 9, 2000), and the new regulation addressing economic analysis, 36 C.F.R. § 219.21 (2003), is different. The Revised EA was published in March 2001. (A.R., 283.) Neither the old regulation, 36 C.F.R. § 219.12(g), nor the new regulation that replaced it, 36 C.F.R. § 219.21, require the Forest Service to utilize a particular methodology in assessing the economic impacts of a proposed project, let alone the quantitative method that the Plaintiffs assert. *See* 36 C.F.R. § 219.12(g) (1982), revised by 65 Fed.Reg. 67514, 67572 (Nov. 9, 2000); 36 C.F.R. § 219.21 (2003). In fact, the new regulation states that the Forest Service may utilize "quantitative, *qualitative*, and participatory methods for gathering and analyzing data;" it does not assert which method must be utilized, however. 36 C.F.R. § 219.21 (2003) (emphasis added).[2] Also, it is worth noting that the old regulation, 36 C.F.R. § 219.12(g), mentioned that monetary valuation is required "to the extent that monetary values can be assigned," 36 C.F.R. § 219.12(g)(3)(ii), but that the new regulation, 36 C.F.R. § 219.21, does not even mention monetary valuation. *See* 36 C.F.R. § 219.21 (2003).

As a result, the qualitative evaluation of impacts utilized by the Forest Service is embraced within the regulations, and the

---

**2.** The old regulation, § 219.12(g), even stated that the Forest Service could utilize "quantitative and qualitative criteria when monetary values may not reasonably be assigned." 36 C.F.R. § 219.12(g)(3)(ii) (1982).

Forest Service complied with the applicable regulations by utilizing a qualitative methodology to assess certain impacts. *See* 36 C.F.R. § 219.21 (2003).

### 6. The Forest Service's Manual and Handbook

 The Plaintiffs also assert that the Forest Service's policies as set forth in the Forest Service's Manual and Handbook require that the Forest Service quantify non-priced benefits and costs. (Plaintiffs' Brief at 30, 31, 32, 33, 35.) The Plaintiffs cite to various provisions of the Forest Service Manual and Handbook which reference economic efficiency analyses. First, the Plaintiffs cite to Forest Service Handbook, (hereinafter, "FSH"), 2409.18 § 13, stating that the "Forest Service's timber sale preparation procedures require economic efficiency analysis to include 'other economic costs and benefits that are not part of Forest Service monetary transactions.'" (Plaintiffs' Brief at 30.) The Plaintiffs attempt to utilize this provision to bolster their argument that 36 C.F.R. § 219.12(g)(3) requires the Forest Service to consider the direct and indirect benefits and costs of Forest Service management; however, as mentioned earlier, this particular regulation has been replaced and the new regulation is much different from the one relied upon by Plaintiffs. In this particular section of the Forest Service Handbook, it references two types of economic analyses. *See* FSH 2409.18 § 13. The first one discussed is a financial efficiency analysis, which "provides a comparison of anticipated costs and revenues that are part of Forest Service monetary transactions." FSH 2409.18 § 13(1). The second type of economic analysis is an economic efficiency analysis, which "uses the cost and revenue estimates included in the financial efficiency analysis, and adds other economic costs and benefits that are not part of Forest Service monetary transac-

tions." FSH 2409.18 § 13(2). The Plaintiffs failed to read further into the discussion of an economic efficiency analysis, however. The FSH states that "[t]his analysis is not required ..." but may be appropriate under certain circumstances, which are not at issue in this case. FSH 2409.18 § 13(2).

In addition, the Plaintiffs failed to recognize key provisions of the FSH, which discuss under what circumstances such an analysis should be done: "[an economic efficiency] analysis is not required, but may be useful and appropriate especially where timber sales are designed primarily to achieve forest stewardship objectives [or where] substantial nonmarket costs and/or benefits are anticipated as a result of the project." FSH 2409.18 § 13(2). The Forest Service Manual, (hereinafter, "FSM"), also states that the "responsible line officer determines the scope, appropriate level, and complexity of economic and social analysis needed." FSM 1970.6. The Forest Service undertook the required financial efficiency analysis, (A.R., 283 at 192), and it qualitatively discussed other non-timber values. (A.R., 283 at 152–57, 161–80.)

As is shown by the excerpts quoted above from the FSH and the FSM, the broader economic efficiency analysis is not required, and such an analysis was not pursued for the Bark Camp Timber Sale. The Forest Service's Economist discussed the reasoning behind not preparing the broader economic efficiency analysis:

This analysis is optional and items included are those non-market outputs which the project has a detrimental effect and "there is excess demand for that output." In the Bark Camp EA we disclose that there may be some displaced use of recreation in the Bark Camp area but there is not an excess demand for this (campgrounds are not

filled near capacity) and the displaced use would most likely shift to other FS sites on the district. In most cases, this type of analysis is included in EIS's and other higher-level analysis such as the national (RPA) and Forest level (Forest Plans).

(A.R., 247 at 1.) Therefore, this court cannot say that this approach of the Forest Service was arbitrary and capricious simply because they utilized a methodology that Plaintiffs do not agree with, nor that the Forest Service's interpretations of its own regulations, manuals or handbooks are plainly erroneous. *See U.S. v. Deaton,* 332 F.3d 698, 709 (4th Cir.2003) (citing *Bowles v. Seminole Rock & Sand Co.,* 325 U.S. 410, 413–14, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945)).

Plaintiffs also rely on FSH 1909.17 § 11.1, in an attempt to support their contention that the Forest Service is under a duty to provide a complete accounting of all costs and all benefits before any particular tract of national forest land is allocated to a specific use such as a timber sale. (Plaintiffs' Brief at 31.) However, FSH 1909.17 § 11.1 only serves to provide a definition of the term "economic efficiency;" it does not serve, as argued by the Plaintiffs, as a mandate. *See* FSH 1909.17 § 11.1

As a result, neither the Forest Service Manual nor the Forest Service Handbook support the contentions of the Plaintiffs.

### 7. Case Law Relied Upon by Plaintiffs

Plaintiffs first rely on the case of *Sierra Club v. Sigler,* 695 F.2d 957 (5th Cir.1983), for the proposition that a NEPA document, like the EA, relied upon by the agency must "fully and accurately disclose the environmental, economic, and technical costs associated with the project." (Plaintiffs' Brief at 30, quoting *Sierra Club,* 695

F.2d at 978.) The Plaintiffs failed to read further, however, because *Sierra Club* also explains that, "NEPA therefore mandates at least a broad, informal cost-benefit analysis by federal agencies of the economic, technical, and environmental costs and benefits of a particular action; a formal monetary analysis is not required." *Sierra Club,* 695 F.2d at 978. *Sierra Club* does not stand for the proposition that a quantitative analysis is required; therefore, the Plaintiffs' reliance on that case for such a proposition is misplaced.

Next, Plaintiffs rely upon *Intermountain Forest Industry Ass'n v. Lyng,* 683 F.Supp. 1330 (D.Wyo.1988), for the proposition that "[m]ultiple-use sustained yield administration must consider the relative values of all resources within the national forests." (Plaintiffs' Brief at 31, citing *Lyng,* 683 F.Supp. at 1337.) However, that case does not stand for the proposition that a particular methodology, especially the methodology envisioned by the Plaintiffs, must be adhered to by the Forest Service. *See generally Lyng,* 683 F.Supp. at 1330–1345.

Finally, the Plaintiffs rely upon *Hughes River I,* 81 F.3d 437 (4th Cir.1996), claiming that the fact that the Forest Service did not assign monetary values to nonpriced benefits is " 'so distorted as to impair fair consideration of the project's adverse environmental effects.' " (Plaintiffs' Brief at 35, quoting *Hughes River I,* 81 F.3d at 446.) However, the Forest Service's actions in this case do not equate to the actions of the Natural Resources Conservation Service and Army Corps of Engineers that were challenged in *Hughes River I.* In *Hughes River I,* the court found that the economic assumptions that were used to assess the economic benefits of a proposed dam project were distorted. *Hughes River I,* 81 F.3d at 446. However, the reason the court reached such a con-

clusion was because of the agencies' use of an inflated estimate of recreation benefits that accounted for a significant portion of the project's economic benefits, an action that was undertaken to possibly produce a positive benefit-to-cost ratio. *Hughes River I*, 81 F.3d at 447. The court did note in *Hughes River I* that both agencies complied with the mandate of the NEPA to balance the project's economic benefits against its environmental effects. *Hughes River I*, 81 F.3d at 447. What the court did not do, however, was hold that a specific method must be utilized, particularly the method advocated by the Plaintiffs in this case. *See generally Hughes River I*, 81 F.3d at 437–51. *Hughes River I* does imply that the use of a quantitative economic benefits analysis and a qualitative environmental analysis is proper; the problem with the agencies' actions in that case was that the agencies had inflated the economic benefits valuation. *Hughes River I*, 81 F.3d at 447. As a result, *Hughes River I* does not lead this court to the conclusion that the Forest Service's methodology was flawed.

## C. The EA's Analysis of Cumulative Impacts and the Original FONSI

The Plaintiffs assert that the EA's analysis of cumulative impacts was inadequate. (Plaintiffs' Brief at 23–25.) Specifically, the Plaintiffs assert that the EA failed to provide an adequate assessment of the amount of past pollution and reasonably foreseeable future pollution "because none of these analyses estimated the amount of sediment that was entering or would enter the area's streams due to these activities." (Plaintiffs' Brief at 24.) In addition, the Plaintiffs assert that the EA failed to "address or consider directly the issue of whether the impacts from past activities were significant, and, if so, whether the cumulative impacts of this timber sale in addition to these past impacts also would

be significant." (Plaintiffs' Brief at 24–25.) After careful review of the record, this court finds that this assertion by the Plaintiffs is also without merit.

NEPA requires that certain procedures be followed when a federal agency undertakes a project that will affect the environment. *Hughes River I*, 81 F.3d at 443. Therefore, when a federal agency undertakes certain actions that will affect the environment, the agency "must prepare a detailed statement" of those impacts. 42 U.S.C.A. § 4332(2)(C) (West 2003). This detailed statement must include an evaluation of the environmental impact of the proposed action and any alternatives to the proposed action. 42 U.S.C.A. § 4332(2)(C) (West 2003). If uncertainty exists as to whether the proposed action will significantly impact the environment, then the agency must conduct an EA. 40 C.F.R. § 1501.4 (2003). If after the agency conducts the EA it makes a FONSI, then an EIS is not required. 40 C.F.R. § 1501.4 (2003). NEPA does not dictate that the agency reach a particular result, but that the agency must follow certain procedures before reaching any result. *Hughes River I*, 81 F.3d at 443.

In evaluating an agency's decision-making process under NEPA, this court begins by determining whether the agency took a "hard look" at the proposed action's impacts upon the environment before deciding to issue a FONSI or proceed with an EIS. *Hughes River I*, 81 F.3d at 443. In doing this, the court must determine whether " 'the adverse environmental effects of the proposed action [have been] adequately identified and evaluated' prior to final decision making." *Hodges*, 300 F.3d at 445 (quoting *Robertson*, 490 U.S. at 350, 109 S.Ct. 1835). If the agency has taken the required "hard look," "[this court] must defer to it unless [the agen-

cy's] decisions were arbitrary or capricious." *Hodges,* 300 F.3d at 446. An agency's consideration of cumulative impacts is part of the agency's required "hard look;" therefore, such consideration is assessed under the same arbitrary and capricious standard. *See Hodges,* 300 F.3d at 446. In addition, an agency's decision that a particular action or actions will not have a significant impact, and that, therefore, no EIS is required will be upheld by this court unless such decision is arbitrary and capricious. *Providence Road Community Ass'n,* 683 F.2d at 82; *CARE,* 643 F.2d at 181–83; *Webb,* 699 F.2d at 159.

██ In addition, an agency is entitled to rely upon its experts when reaching conclusions about the impacts of proposed actions. *Friends of Richards–Gebaur Airport v. Federal Aviation Admin.,* 251 F.3d 1178, 1189 (8th Cir.2001) (holding that an agency does not act arbitrary or capricious when it relies on expert government agencies and expert consultants); *Hughes River Conservancy v. Johnson,* (hereinafter, *Hughes River II* ), 165 F.3d 283, 288 (4th Cir.1999). "An agency's decision to rely on an Environmental Assessment instead of preparing an Environmental Impact Statement is entitled to deference from the courts." *Mt. Lookout–Mt. Nebo Property Protection Ass'n v. F.E.R.C.,* 143 F.3d 165, 172 (4th Cir.1998) (citing *South Carolina v. O'Leary,* 64 F.3d 892, 896 (4th Cir.1995); *Providence Rd. Community Ass'n,* 683 F.2d at 82).

██ When considering the impacts a proposed project will have on the environment, the agency must consider and evaluate the cumulative impacts of the proposed project. 40 C.F.R. § 1508.25(c)(3) (2003). The regulations define cumulative impacts as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions

. . . Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7 (2003). The Fourth Circuit has mandated that when a court is assessing an agency's compliance with this duty, the court must ascertain whether there is an adequate basis for the cumulative impacts finding in the record. *Roanoke River Basin Ass'n v. Hudson,* 940 F.2d 58, 64 (4th Cir.1991.) If the court determines that the agency's conclusions regarding cumulative impacts are adequate, then the court must find that the cumulative impacts analysis is not arbitrary and capricious. *Hudson,* 940 F.2d at 64.

██ This court finds that the EA at issue in this case examined the cumulative impacts of the Bark Camp Timber Sale, and that the Forest Service's conclusions regarding the cumulative impacts were adequate. As the Plaintiffs note in their brief, the EA openly discloses the existing condition of the streams in the Bark Camp Area. (A.R., 283 at 76–77.) In addition, the EA begins by providing a list of the past and reasonably foreseeable future actions in the Bark Camp Area that might contribute to the cumulative impacts. (A.R., 283 at 50–56.) The Forest Service included in the EA a discussion of the historical land use of the Bark Camp Area from the late 1700s to the present. (A.R., 283 at 50–94.) This analysis included a discussion of past timber management activities; special uses; temporary roads; mineral, oil and gas harvesting; recreational activities; wildlife and fisheries activities; and discernable activities on private lands within the watershed areas. (A.R., 283 at 50–56.) In addition, the Forest Service analyzed how these past activities contributed to the cumulative impacts on resources in the Bark Camp Area watershed. (A.R., 283 at 50–56.) Therefore,

the Forest Service, contrary to the Plaintiffs' assertion, did look at past sources of pollution.

The Forest Service did not stop there either. The Forest Service also analyzed the existing conditions in the watershed. (A.R., 283 at 74–83.) The Forest Service utilized the 1998 Virginia Water Quality Assessment Report 305(b) as part of its analysis. (A.R., 283 at 82–83.)[3] The Forest Service also evaluated the following attributes in each area stream in the Bark Camp Area: percent of cobble embeddedness; channel gradient percentage; water temperature; pool habitat; riffle stability index; residual pool volume; habitat type; habitat quality and size; and abundance of large woody debris. (A.R., 283 at 87, Table 19; 88, Table 20; 89; A.R., 174, at 2.) The Forest Service's evaluation showed that past logging activities resulted in cobble embeddedness, braiding and an abundance of run/glide habitat. (A.R., 283 at 74; A.R., 174 at 2.) In response to the current condition of the waterways in the watershed, which logically would include the impacts of past activities in the area because the present conditions of the waterways are the result of the past occurrences in and around those waterways, the Forest Service proposed certain mitigating factors to offset most of the impact associated with the proposed Project. (A.R., 283 at 31–46.) Consequently, the Forest Service recognized the need for further measures to minimize the environmental impacts of the proposed project and adopted those mitigation measures in the original Decision Notice, (A.R., 284 at 7), and the Amended Decision Notice, (A.R., 406 at 5.)

After the Forest Service considered the past impacts on the streams in the watersheds in conjunction with the current conditions of the same streams, the Forest Service utilized a sediment model to establish the impact of the proposed Project on the streams. (A.R., 283 at 80; A.R., 173 (Bark Camp Timber Sale Sediment Model).) This model utilized a "worst case scenario" where it was assumed that all of the impacts to the area's streams would take place within the first year of the project. (A.R., 283 at 79.) In addition, the sediment model also assumed that all Forest Plan standards and guidelines and Virginia Best Management Practices for Forestry would be employed. (A.R., 283 at 79.) The Forest Service then determined that for the proposed project not to have a significant impact that the condition of the streams would have to remain within the range of natural variability. (*See* A.R., 283 at 78–83.) Utilizing the sediment model, the Forest Service determined that the additional sediment that would be added to the streams would not significantly impact those streams because the condition of the streams would remain within the range of natural variability. (A.R., 283 at 80–83.) As a result, the Forest Service considered the past, present and future effects of the proposed

---

**3.** Specifically, the 1998 Virginia Water Quality Assessment Report 305(b) based its findings on (1) a non-point source rating, which is "based on a weighted combination of influences from agriculture, urban sources and forestry," and (2) a National Heritage rating, which is "based on the presence of habitat for rare, threatened or endangered plants or animals or exemplary natural communities." (A.R., 283 at 83.) The Virginia Water Quality Assessment Report concluded that Stony Creek had a non-point source rating of Low and a Natural Heritage Rating of Medium. (A.R., 283 at 82.) In addition, the Virginia Water Quality Assessment concluded that Little Stony Creek had a non-point source rating of Medium and a Natural Heritage rating of High. (A.R., 283 at 82–83.) The ratings of Little Stony Creek are higher because the main stem of the Clinch River was included in the watershed unit boundary, and because of a higher percentage of agricultural and urban land use in that unit. (A.R., 283 at 83.)

project before coming to the conclusion that the proposed project would not significantly impact the environment.

The Forest Service is not required, as implied by the Plaintiffs, to quantify the cumulative impacts. In fact the Council on Environmental Quality has provided guidance on assessing cumulative impacts, and it states:

[i]f cause-and-effect relationships cannot be quantified, or if quantification is not needed to adequately characterize the consequences of each alternative, *qualitative evaluation procedures can be used* ... Often, the analyst will be limited to qualitative evaluations of effects because cause-and-effect relationships are poorly understood or because few site-specific data are available.

(Exhibit E at 41 attached to the Defendants' Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, (hereinafter, "Defendants' Brief"), Docket Item No. 36 (emphasis added).) Therefore, NEPA does not require the Forest Service to use a particular methodology when assessing cumulative impacts. In addition, the Fourth Circuit has stated that "[a]gencies are entitled to select their own methodology as long as that methodology is reasonable." *Hughes River II*, 165 F.3d at 289. Furthermore, the agency's expertise on how to measure environmental impacts is entitled to deference. *See Hughes River II*, 165 F.3d at 289–90.

This court finds, therefore, that the Forest Service engaged in the required "hard look" at the cumulative impacts of past, present and future activities in the area before it determined that the proposed project would not have a significant impact on the environment. Based on the discussion above, this court also finds that there is an adequate basis for the Forest Ser-

vice's cumulative impacts finding in the record. In addition, since NEPA does not require that the Forest Service utilize a particular methodology in assessing the cumulative environmental impacts caused by a proposed project and the Forest Service took the requisite "hard look" at the cumulative impacts of past, present and future activities in the area, this court finds that the Plaintiffs are unable to prove that the Forest Service's evaluation of cumulative impacts was arbitrary and capricious.

Even given the information included above, the Plaintiffs assert that the Forest Service's Original FONSI for the Bark Camp Timber Sale was not supported by the record, and that substantial questions were raised as to whether the Bark Camp Timber Sale would have a significant impact on the area's resources, requiring an EIS. (Plaintiff's Brief at 25.) In an attempt to support their allegations that the Forest Service should have completed an EIS because its Original FONSI was arbitrary and capricious, the Plaintiffs rely upon the EA's recitation of the existing conditions of the waterways in the watershed and the alleged 10% "threshold" that was supposedly set forth in the EA. (Plaintiffs' Brief at 25–26.) As stated above, the Forest Service did consider the cumulative impacts to the waterways in the watershed, including the current condition of the watershed; therefore, Plaintiffs fail to prove that the agency's determination of FONSI was arbitrary and capricious, which they are required to do. In addition, as stated above, the EA did not set the 10% increase in sediment yield as a significance threshold; therefore, the court need not address that issue here again because Plaintiffs' reliance on that argument is without merit.

Given the EA's extensive discussion of the current conditions of the watershed,

which obviously include any past activities in and around the watershed, the Forest Service's adoption of certain mitigation factors to reduce the impact to the environment in the Bark Camp Area, the Forest Service's use of scientific data and models in determining the extent of the impacts to the environment and the Forest Service's determination that the Project will not increase sediment beyond the level of natural variability, this court finds that the Forest Service took the requisite "hard look" in determining whether the impacts of the Project would be significant. This court also finds, based on the above discussion, that the Plaintiffs have failed to prove that the Original FONSI was arbitrary and capricious because they fail to raise substantial questions that a project may have a significant impact. *See Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146, 1150 (9th Cir.1998). Therefore, the Forest Service's Original FONSI was not arbitrary and capricious, and the Forest Service was not required to complete an EIS.

## D. The Post–EA Floods and the Amended FONSI

■ The Plaintiffs also argue that the Forest Service's Amended FONSI that was issued after the floods was arbitrary and capricious. (Plaintiffs' Brief at 26–27.) To support this argument, the Plaintiffs argue that the floods "significantly altered [the] streams and watersheds, causing widespread erosion, multiple landslides, and massive sedimentation of these already-impaired streams." (Plaintiffs' Brief at 26.) The Plaintiffs also attempt to support this argument by referring to the removal of the Large Woody Debris Project after the floods; this argument will be addressed in a separate section below. (Plaintiffs' Brief at 26.) However, this court finds that the new circumstances created by the post-EA floods were adequately and properly analyzed by the For-

est Service, and that the Amended FONSI was well-reasoned and in full compliance with NEPA.

■ For new circumstances to trigger the need for a supplemental NEPA document, the new circumstances " 'must present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned.' " *Hughes River I,* 81 F.3d at 443 (quoting *Hickory Neighborhood Defense League v. Skinner,* 893 F.2d 58, 63 (4th Cir.1990)) (emphasis in original). An agency's inquiry into whether new facts or circumstances are significant enough to require a supplemental EA or EIS is fundamentally different from the decisions an agency is required to make during the initial EA or EIS process. *See Hodges,* 300 F.3d at 446. An agency is not required to produce a NEPA document nor follow the full NEPA process when it is making the preliminary decision as to whether a supplemental NEPA document is required as a result of the changed circumstances. *See Hodges,* 300 F.3d at 446; *see also Price Rd. Neighborhood Ass'n v. U.S. Dep't. of Transportation,* 113 F.3d 1505, 1509 (9th Cir.1997) ("[A] agency need not start the environmental process anew with every change in a project."). No supplemental EA or EIS is required when the changed action will not result in any new unconsidered environmental impacts. *See Hodges,* 300 F.3d at 448–49; *Price Road,* 113 F.3d at 1509–10; *Piedmont Environmental Council v. United States Dep't. of Transportation,* 159 F.Supp.2d 260, 270, 281–83 (W.D.Va.2001.)

This court finds that the Forest Service took the mandated "hard look" before issuing the Amended FONSI. Soon after the floods that affected the Bark Camp Area, the Forest Service placed the Project on hold until it could assess the impacts that

the floods had on the Bark Camp Area. In order to ascertain the impacts of the floods, the Forest Service conducted on-the-ground assessments and from-the-air assessments of the impacts of the floods in the Bark Camp Area. (A.R., 356, 358, 360, 387, 389, 392, 400.) During these assessments, the Forest Service made note of the general condition of the streams, including whether there had been significant landslides or additional sediment delivered to the streams. (A.R., 356, 358, 360, 387, 389, 392, 400.) The assessment also included an examination of the sediment, cobble, boulders and debris movement of the streams in the Bark Camp Area. (A.R., 404 at 6–18.) The assessment determined that the storm and subsequent floods created debris dams, moved many boulders, created large woody debris, scoured some areas and moved sediment. (A.R., 404 at 6–18.) In addition, the Forest Service conducted detailed analyses of the waterways in 1997, 2001 and 2002, and compared the conditions of the streams at each of those time intervals. (A.R., 400.)

During the review process, the Forest Service also enlisted the assistance of scientists from Virginia Tech to examine the landslides in the area and to ascertain the cause of the landslides. (A.R., 353.) By examining other areas of the National Forests, the scientists were able to ascertain that the landslides caused by the storms in the Bark Camp Area were not the result of logging activities or road construction that had taken place in those areas. (A.R., 353 at 6.)

The Forest Service also participated in an Advisory Committee to help with the reevaluation process. (A.R., 350, 352, 355, 357.)[4] This Advisory Committee, among other things, considered scientific data that was collected and viewed presentations on that data from the Forest Service as well as independent scientists. (A.R., 358, 368, 373, 374, 376, 377, 379, 380, 383, 389, 390, 391, 396.)

The Forest Service scientists then reviewed the data and evidence collected during the review by the Forest Service and the Advisory Committee both before and after the floods and concluded that (1) there had been no change in the streams' ability to support instream beneficial uses after the flood; (2) the sediment from the flood would not individually or cumulatively significantly impact the streams and their instream beneficial uses, including fish; (3) the Bark Camp Project would not significantly impact the potential for future debris slides; and (4) the increase in flood levels that the Bark Camp Project could cause would be immeasurable and did not constitute a cumulative significant impact. (A.R., 404 at 1–3.) In doing this, the Forest Service provided an explanation of the condition of each waterway, the effects the flood had on each waterway, how the current conditions affected the health and character of the waterway and the bases for their conclusion with respect to each stream. (A.R., 404 at 1–49.)

Based on the recommendations of the Forest Service scientists, the Forest Service issued an Amended FONSI, stating that they would continue with the Project with minor changes. (A.R., 406.) The main reason for continuing with the project cited by the Forest Service was that the original reasons given for undertaking the project, the lack of early successional habitat, continued to exist even after the floods. (A.R., 406 at 6.) Given the preced-

---

4. This Advisory Committee included U.S. Congressman Rick Boucher and a member of his staff, the Mayor of the Town of Dungannon, representatives from the Forest Service, the Clinch Coalition, the Nature Conservancy, U.S. Fish and Wildlife Service, the U.S. Army Corps of Engineers, and a local tourist organization. (A.R., 364.)

ing discussion, this court finds that the Forest Service conducted the requisite "hard look."

In addition, this court finds that the decision to continue with the project with minor changes is not arbitrary and capricious because that decision is supported by the record, the evidence that was gathered subsequent to the floods and the recommendations of scientists who studied the effects of the floods, and the decision was also arrived at after public input. Given the information set forth above, it is evident that the Forest Service thoroughly evaluated the condition of the watershed after the floods occurred.

In addition, the Forest Service properly relied upon the findings of scientific experts from Virginia Tech who also studied the effects of the floods on the Bark Camp Area. Even though there were conflicting opinions, this court cannot find that the Forest Service's actions were arbitrary and capricious. An agency is "entitled to use its own methodology, unless it is irrational." *Sierra Club v. Marita*, 46 F.3d 606, 621 (7th Cir.1995). The fact that certain experts disagree with the agency's conclusions does not render the agency's decision arbitrary and capricious. *See Marita*, 46 F.3d at 621. "When there is conflicting expert opinion, it is for the administrative agency and not the courts to resolve the conflict." *Webb*, 699 F.2d at 160.

The Plaintiffs requested that a hydrologist, Barry Sulkin, review the data concerning the impacts of the floods on the Bark Camp Area. (A.R., 368.) After reviewing the data concerning the impacts of the floods, Mr. Sulkin concluded that the Forest Service improperly estimated the amount of sediment delivery because its methodology was flawed. (A.R., 368 at 3–5.) Ultimately, Mr. Sulkin opined that the Forest Service needed to conduct further studies in the area, and that the Large Woody Debris Program was not needed. (A.R., 368 at 7.)

During the review process, the Forest Service considered and rejected Mr. Sulkin's report. (A.R., 370.) The Forest Service's scientists explained their methodology and why that methodology was not flawed. (A.R., 370.) Specifically, the Forest Service rejected Mr. Sulkin's report because it was based on observations that followed one of the worst floods in the last 100 years, and that estimations based on extreme events are not reasonable. (A.R., 370 at 1.) The Forest Service further noted that their analysis included an observation of nearby watersheds in which timber harvest had occurred, and that the data collected revealed that the flood effects were no worse in those areas than in areas where no timber harvest had taken place. (A.R., 370 at 1–3.) Provided that the Forest Service dismissed the conclusions of Mr. Sulkin *with detailed explanation*, this court is not in the position to find its actions arbitrary and capricious.

The Forest Service also considered and rejected the report offered by Tom R. Davenport and Dr. Robert L. Krystock, who utilized a statistical model to ascertain the likelihood of the relationship between timber harvest and debris slides in the watershed. (A.R., 396.) Mr. Davenport and Dr. Krystock opined that there was a relationship between the two. (A.R., 396.) This report was reviewed by the Virginia Tech scientists and members of the statistics faculty at Virginia Tech, who noted fatal flaws in the statistical analysis and the methods utilized by Mr. Davenport and Dr. Krystock. (A.R., 402.) As a result, this report was found to be unreliable. (A.R., 402.)

Eventhough, as evidenced in the preceding paragraphs, there were opinions that did not agree with the methodology or

conclusions of the Forest Service with regard to sediment delivery, landslides and how the Project would affect the Bark Camp Area, the actions of the Forest Service are not rendered arbitrary and capricious because, as discussed in detail above, the Forest Service based its conclusions on other scientific data that was collected.

Consequently, this court now finds that the Forest Service took the mandated "hard look" at the conditions of the watershed after the floods and determined, through research, scientific data and public input, that there were no new unconsidered environmental impacts; therefore, no further NEPA document was required. *See Hodges,* 300 F.3d at 448–49; *Price Rd.,* 113 F.3d at 1509–10; *Piedmont Environmental Council,* 159 F.Supp.2d at 270, 281–83. In addition, this court finds that the Forest Service reached its Amended FONSI after careful consideration of the data that was presented to it concerning the floods; therefore, the decision to issue an Amended FONSI and not to complete an EIS or a supplemental EA was not arbitrary and capricious.

### E. Removal of the Large Woody Debris Project

Even though the Plaintiffs agree with the elimination of the Large Woody Debris Project, (Plaintiffs' Brief at 20), the Plaintiffs assert that the Forest Service arbitrarily eliminated the Large Woody Debris Project, contrary to the EA's reliance on this project for mitigation to support the Forest Service's Original FONSI. (Plaintiffs' Brief at 18.) The Plaintiffs also assert that, despite the Forests Service's reliance on the Large Woody Debris Project as a mitigating factor, the Forest Service removed this program 18 months after the publication of the EA. (Plaintiffs' Brief at 19.) According to the Plaintiffs this action was violative of NEPA, "because it removed a primary basis for the finding of no significant impact to the area's streams, fish, and aquatic life, and it was arbitrary because the reason given for eliminating the project was not supported by the record." (Plaintiffs' Brief at 19–20.)

█ Upon review of the record, this court finds the claims of the Plaintiffs with regard to the removal of the Large Woody Debris Project to be without merit. First, the Plaintiffs assert that the Large Woody Debris Project is a "mitigation measure." However, nowhere in the long, exhaustive list of mitigation measures in the EA does the Forest Service mention the Large Woody Debris Project as a mitigation measure. (A.R., 283 at 32–46.) In fact, the EA refers to the Large Woody Debris Project as an associate project, of which a total of eleven such projects were proposed in the EA. (A.R., 283 at 29.) In the list of mitigation factors, certain mitigation factors are listed to mitigate the impacts of the Large Woody Debris Project. (A.R., 283 at 44.) It makes no logical sense for the Forest Service to discuss mitigation measures of mitigation measures. Therefore, Plaintiffs' assertion that the Large Woody Debris Project is a mitigation measure is misplaced.

In addition, the removal of the Large Woody Debris Project took place after significant flooding in the Bark Camp Area. As stated above, the new circumstances created by the post-EA floods were fully and properly analyzed; therefore, the Forest Service took the requisite "hard look" before it issued its Amended FONSI. As a result, the Amended FONSI was not arbitrary and capricious and was in full compliance with NEPA.

After the post-EA floods occurred, the Forest Service placed the Bark Camp Timber Sale project on hold until it could determine the impacts of the floods on the Project area. The Forest Service conduct-

ed a thorough investigation of the Bark Camp Area, including on-the-ground assessments and from-the-air assessments. (A.R., 356, 358, 360, 387, 389, 392, 400.) The Forest Service also engaged scientific experts from Virginia Tech to look at the occurrence of landslides and the contributing factors of the landslides in the Bark Camp Area. (A.R., 353.) The Forest Service also looked at the placement and amount of debris in the waterways. (A.R., 400, 404.) Utilizing these factors as well as others, the Forest Service determined that its prior impacts analysis was unchanged, except that the Large Woody Debris Project was no longer necessary because the floods and a large blow-down in 1998 had raised the amount of debris present in the waterways above the amount that would be added by the Large Woody Debris Project. (A.R., 406.) In effect, the floods implemented and completed the Large Woody Debris Project for the Forest Service; therefore, there was no longer a need to add further debris to the Bark Camp Area's streams.

The Plaintiffs continue to assert, however, that the Large Woody Debris Project was a key factor in the Forest Service's Original FONSI. (Plaintiffs' Brief at 19.) The Plaintiffs assert that the Large Woody Debris Program was relied on in the water quality and fisheries analyses included in the EA. (Plaintiffs' Brief at 19.) In addition, the Plaintiffs assert that the Original FONSI "followed the EA in concluding that the adverse affects on spawning habitat, especially effective spawning habitat, would be 'more than offset' by the large woody debris recruitment project." (Plaintiffs' Brief at 19.) The Plaintiffs wish this court to agree with them that the Forest Service hinged its Original FONSI almost entirely on the Large Woody Debris Project. (Plaintiffs' Brief at 19.) That is a conclusion that this court cannot make because many more factors, as evidenced in the discussion above, were considered before a FONSI was issued.

As stated above, the Large Woody Debris Project was never intended to be a mitigation measure, but an associate project. Further, while it may be true that the Large Woody Debris Project was considered in coming to the conclusion that the Project would have no net effect on fisheries and only minimal impact on water quality, the Large Woody Debris Project was only one factor among many that were considered. In fact, among other things, the many mitigation measures listed in the EA were identified as factors leading to the conclusion of no net effect. (A.R., 283, at 83.) As a result, the Plaintiffs' assertion that the Large Woody Debris Project was the "primary basis for the finding of no significant impact to the area's streams, fish, and aquatic life" is not supported by the record. (Plaintiffs' Brief at 19–20.) As stated in the previous section discussing the Amended FONSI that was issued after these floods, the Forest Service took the required "hard look" to determine whether the floods significantly changed the earlier impacts assessment. Because the Forest Service took this "hard look;" the Large Woody Debris Project was not a critical component in the FONSI; and the Forest Service adequately explained the reason the Large Woody Debris Project was no longer needed, the elimination of the Large Woody Debris Project was not arbitrary or capricious.

### IV. Conclusion

In conclusion, this court notes that the Project at issue in this litigation has now been under consideration since the late 1990s. Competing interests have been shown from various environmental groups such as the Clinch Coalition on the one hand and the Ruffed Grouse Society on the other hand. It is now time to bring this

matter to a conclusion; however, in bringing this matter to a conclusion, this court notes that it is highly unlikely that a project of this magnitude, which raises various environmental interests, will be aggreeable to everyone.

After careful review of the record, it is so **ORDERED** that the Motion for Summary Judgment filed on behalf of the Defendants is hereby **GRANTED**; the Motion for Summary Judgment filed on behalf of the Intervenors is hereby **GRANTED**; and the Motion for Summary Judgment filed on behalf of the Plaintiffs is hereby **DENIED**. Therefore, the decision of the United States Forest Service is hereby **UPHELD**.

An Appropriate Order will be entered.

The clerk is directed to send certified copies of this Memorandum Opinion and accompanying Order to all counsel of record.